(No. 40705.—)

The People of the State of Illinois, Appellee, *vs.* Russell Charles Dewey, Appellant.

*Opinion filed March 27, 1969.*

Roy S. LASSWELL, of LASSWELL & SODERGREN, appointed by the court, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and WILLIAM R. NASH, State's Attorney, of Rockford, (FRED G. LEACH, Assistant Attorney General, and ALFRED W. COWAN, JR., Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Defendant, Russell Charles Dewey, was indicted by the Winnebago County grand jury for the murder of Susan Brady. A change of venue was sought and the cause was transferred to the circuit court of DeKalb County. A jury

found the defendant guilty, and he was sentenced to a term of 20 to 50 years in the penitentiary. This appeal followed.

Susan Brady, an eleven-year-old girl, was last seen alive on December 20, 1965, at approximately 5:30 P.M. She had gone to the home of her girl friend after school and was returning to her home. The friend, Cecelia Burns, had walked part way home with Susan and left her on the south side of School Street, being an east-west street in the city of Rockford, Illinois, where School Street intersects Albert Avenue, a north-south street. It was dark when Cecelia started back home in an easterly direction as Susan continued west on the south side of School Street. A witness for the People testified that possibly a few minutes before 6:00 o'clock P.M., he heard screaming out in front of his home and then a car starting fast and spinning its wheels on the street. His home was on the south side of School Street and to the west of Albert Avenue.

The defendant testified that at the approximate time and place in question he was driving his automobile in a westerly direction on School Street when he struck a young girl with the left front of his automobile. He testified that he did not see the child until she was immediately in front of his car. His first thought was to leave the scene because he had no insurance. He drove one-half block, stopped the car and made an inspection to see if any headlights were broken. He looked back and saw nothing. He then started backing the car with the lights off when he felt the rear of his car bump over something. He got out of the car and discovered the child underneath. He placed her in his car with the intention of taking her to a hospital, but then determined that she was dead and decided to dispose of her body.

The defendant stated that he proceeded directly to his home with the body and placed it in a 55-gallon drum type incinerator in his garage and caused it to be thoroughly burned through the night. The next morning he removed

all ashes and remains and placed them in a dump at his place of employment.

The defendant lived alone in the home of his grandparents outside the city limits of Rockford during November and December 1965, while they were in Florida. He was 25 years old, unmarried and worked at the J. I. Case Company in Rockford, He owned a 1961 green Cadillac.

Between 6:30 and 7:00 P.M. on December 20, 1965, defendant purchased a gallon can of gasoline and had the tank of his Cadillac filled at a gas station near his grandparents' home. About mid-morning of the next day, defendant was observed at the J. I. Case Company dump throwing some unknown material from his grandfather's pickup truck into the fire. On December 31, 1965, defendant quit his job at J. I. Case Company without prior notice. He headed for Florida in his Cadillac, but in Georgia he had an automobile accident and decided to return to Rockford. He felt that the police in Georgia would be looking for him since he had given them a fictitious insurance policy number. On January 4, 1966, defendant helped his mother and stepfather move out of their apartment in Rockford without notice. On January 5, 1966, defendant sold his Cadillac to a Rockford auto dealer for $650, and drove to San Diego with his mother, step-father and step-uncle. On January 14, 1966, defendant telephoned Helen Jarley, his former mother-in-law, in Rockford. She told him that the Rockford police were looking for 1961 Cadillacs in connection with the disappearance of Susan Brady. The next day defendant left a note to his step-father, Gene Neal, saying that he had struck the missing girl in Rockford with his car and that she died. He stated that he became frightened because he did not have insurance, took her to the Carruthers's residence and dumped her body where it would never be found. Defendant then left for Mexico.

Subsequent to the sale of defendant's car in Rockford, the Federal Bureau of Investigation entered the case.

Special agents interviewed defendant's relatives in California on January 18, 1966, and learned of the note. On January 20, 1966, Rockford police and agents from the Chicago office of the FBI searched the Carruthers's residence in Rockford and found tiny bone fragments and strands of hair in and beneath a trash burner located in a garage to the rear of the Carruthers's residence. The officers also found a sledge hammer which had several tiny spots on the non-striking part of the head which appeared to be blood. These items were collected, preserved and shipped to the FBI laboratory in Washington, D.C. for analysis.

On January 20-21, 1966, Rockford police and FBI agents examined the inside and outside of defendant's Cadillac, and several items were removed from the car and sent to the FBI laboratory for analysis. At this time, a State warrant charging Failure to Report an Accident Involving Death was issued. A Federal warrant charging Unlawful Flight to Avoid Prosecution was also issued, and the FBI sought the defendant in Mexico.

On February 13, 1966, the defendant returned to San Diego and checked into a hotel under the name of "William Neal". On February 14, 1966, he contacted his relatives in San Diego and asked his step-father to call the FBI. They responded to a call and placed the defendant under arrest. In subsequent interviews with the FBI, defendant's version of the death of Susan Brady was that he had struck Susan with his car, panicked, and burned her body in the trash burner at the Carruthers's garage. On February 14, 1966, a murder warrant was issued against the defendant in Illinois.

A physical anthropologist from the Smithsonian Institute examined the fragmented bones found in and near the incinerator and testified that the bones consisted of the first cervical vertebra, portions of the skull, consisting largely of the facial area and teeth, and bones from the fingers and toes. The anthropologist testified that all of the bones bore

evidence of burning and all were of human origin from a child eight to twelve years old.

A witness from the FBI laboratory testified that the hair found in the incinerator consisted of several dozen dark brown, human head hairs, of Caucasian origin. They had been singed. Susan Brady had dark brown hair. Another laboratory witness testified that he found tiny splatters of blood on both sides of the sledge hammer found in the Carruthers's garage. The blood was of human origin but the type could not be determined. No other human remains were found at the Carruthers's residence, at the J. I. Case dump, or anywhere else.

A Rockford police officer testified that he and a special agent from the FBI spent nine hours examining defendant's car on January 20-21, 1966. The entire automobile was examined with particular attention to whether anything might indicate that it had been involved in an auto accident. Seventeen items were removed from the car and sent to the FBI laboratory. These items, many from the auto's undercarriage, were examined to determine the presence of blood, but none was found. The officers testified that they found no damage or repairs to the front of the auto.

An auto repair man testified that he examined defendant's Cadillac on January 3, 1966, in order to give defendant an estimate of what it would cost to repair the damage to the rear of the car done in Georgia a few days before. He stated that he noticed no dents, scratches, bumps or damage on the front of the car.

A long-time friend of defendant who purchased the car from him on January 5, 1966, testified that he noticed a small dent on the left front fender when he bought the car. A body and fender man who repaired the damage to the rear portion of the car for the auto dealer, testified that there was no damage to the left front fender.

Between 5:00 and 5:30 P.M. on the evening that Susan

Brady disappeared, Patricia Brenner, age 12, was returning to her home from the neighborhood grocery store. She was walking alone along Blaisdell which runs parallel to and one block north of School Street. A man in a light green Cadillac stopped and asked if she wanted a ride. She refused, and he drove off. At the trial, Patricia identified defendant as the person who approached her on Blaisdell on the night in question. In addition to the Brenner incident, testimony was also produced that on the morning of December 16, 1965, at 7:50 A.M., Andria Peterson, age 12, was approached by a stranger while she was walking to school in Belvidere, Illinois. The stranger was driving a green Cadillac with electrically operated windows. He offered to give her a ride to school which she refused. At the trial she identified defendant as the man in the Cadillac. Later that same day, Adrenne Carlson, age 12, was approached by a stranger on the east side of Rockford at 4:30 to 4:45 P.M. Adrenne was returning from the grocery store, and the man who stopped was driving a 1961 green Cadillac with electrically operated windows. He offered her a ride which she declined. The man was 20-23 years old and wore a brown corduroy coat and dark rimmed glasses. Defendant owned such a coat. Similar glasses had been issued to defendant by his employer. On December 13, 1965, at about 4:20 P.M., Patricia Cassarato, age 13, was offered a ride by defendant in his green Cadillac when she was walking along School Street one block from St. Patrick School. She accepted the ride, and defendant drove her home. At the trial, defendant admitted being the person involved in the Brenner, Peterson and Cassarato incidents.

FBI interviews with defendant were held on February 13, 14 and 15, 1966. Subsequent to his interview on February 14, 1966, defendant appeared before a Federal Commissioner, and counsel was appointed for him. The trial court suppressed defendant's statements made to the FBI

on February 15, 1966, and subsequent statements made to Rockford police officers.

The defendant argues that the admission into evidence of his statements made to the FBI on February 13 and 14, 1966, violated his constitutional rights to assistance of counsel and against self-incrimination under the doctrine of *Miranda* v. *Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Defendant specifically argues that he was never advised that he had a right to remain silent, which is different from advising him that "he does not have to make a statement;" that he was not advised that he had a right to the presence of an attorney; that he was not advised that as an indigent he had a right to an appointed attorney; that when he refused to sign a prepared statement all interrogation should have stopped; and that trickery and a lack of fairness were employed by the FBI agents in that they held the defendant on a Federal fugitive warrant and advised him of his rights on such charge when in fact their sole purpose of interrogation was on a State charge of murder as opposed to the relatively minor charge of leaving the scene of an accident where a death was involved. He claims further deception in not advising him that his mother was trying to see him and of informing her that she would be able to visit him a week later on visiting day at the jail.

When the defendant was taken into custody by the FBI agents in San Diego, California, he was advised "that he did not have to say anything, and that anything he did say could be used against him in a Court of Law." Once in the car, the defendant started to say something but was stopped from talking by the agents who advised him to remain silent until they arrived at the FBI office. The agents testified that upon arrival at the office, the defendant was advised before the interview that he did not have to say anything, that anything he did say could be used against him in a court of law, that he had a right to consult with an attorney or any-

one else prior to making his statement, and that if he could not afford an attorney, the court would provide one for him.

The defendant's denial that the above warnings were given to him was vague and equivocal, and his argument that they do not comply with the standards of *Miranda* is unconvincing. The agents' testimony was precisely detailed and credited by the trial judge who ruled in favor of admissibility. *People* v. *Spencer,* 27 Ill.2d 320, 325. We approve that ruling.

The defendant's charge of "trickery" and deception on the part of the FBI agents is unwarranted. The last interview occurred in San Diego on February 15, 1966, and the murder warrant was issued in Rockford, Illinois, on February 14, 1966. Special Agent McCluggage, who is the object of these accusations, denied that he had any knowledge that a murder warrant had been issued for defendant until after the interviews had been completed.

The defendant's claim that his mother was not allowed to visit him is not supported by the evidence. Defendant was arrested in the presence of his mother by the FBI agents who identified themselves and advised the defendant's mother to contact the San Diego County jail in regard to visitation. The defendant's mother again talked with Special Agent McCluggage at the FBI office shortly after defendant's arrest. McCluggage contacted the county jail for defendant's mother and then informed her about the visiting hours at the jail.

Defendant now claims that his refusal to sign a statement prepared by the FBI indicated that he wished the interrogation to stop. This alleged indication, however, lacks an evidentiary basis. After his refusal to sign, the defendant was again interrogated the following day, and at no time during the interview did the defendant indicate that he did not want to answer questions, nor did the defendant himself ever testify at the trial that he did not wish to answer the agents' questions. The defendant was even willing to make

statements to the agents, which were later suppressed, after his appointed counsel had told him to say nothing.

The defendant next contends that the trial court erred by allowing the introduction of evidence that defendant attempted to pick up girls of the same age as Susan Brady in his car on prior occasions. It is argued that such testimony of misconduct with other young girls deprived the defendant of his constitutional right to presumption of innocence. Evidence which tends to prove a fact in issue is admissible even though it discloses that the defendant committed another crime, and evidence which establishes motive, intent, identity, accident or absence of mistake is admissible even though it may also involve proof of a separate offense. (*People* v. *Harvey*, 12 Ill.2d 88.) Also, evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime. (*People* v. *Cole*, 29 Ill.2d 501.) In this case, the evidence complained of did not constitute a criminal offense. Throughout the trial, the defendant claimed that he had accidentally struck Susan Brady with his car when she darted in front of him, and that he put her in his automobile after she was injured for the purpose of taking her to a hospital. Whether Susan died by accidental or criminal means was a question of fact for the jury, and the evidence under consideration was probative of that fact and therefore admissible on the authority of the cases cited above.

Defendant maintains that the trial court erred in refusing his tendered instructions defining the offenses of involuntary manslaughter and reckless homicide, and that by this commission of error he was denied the opportunity to have the jury instructed on his theory of the case. We are of the opinion that the giving of instructions on the above offenses would have been erroneous since there is no evidence in the record to support them. (*People* v. *Latimer*, 35 Ill.2d 178.) The defendant testified that he struck the girl when she darted in front of his car. He finally stopped, turned off his

lights, looked back and could see nothing. He backed up to see if someone was injured and in so doing, backed over the girl. He proceeded to the hospital with the girl, but on the way, she died. Both involuntary manslaughter and reckless homicide require, as an element of the offense, a conscious disregard of a substantial risk. (Ill. Rev. Stat. 1967, ch. 38, par. 4—6.) There was no conscious disregard of a substantial risk on the part of the defendant. The death of Susan Brady, under the evidence presented, resulted from either negligent or criminal conduct, and could not have occurred as a result of the offenses for which the instructions were sought. *People* v. *Burnett, 27* Ill.2d 510.

We must next consider whether the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt of the crime of murder. Defendant admitted killing Susan Brady, but contended that the death was accidental. The jury was, therefore, called upon to determine the means and manner of death from the circumstantial evidence presented. (*People* v. *Fedora,* 393 Ill. 165.) In this case, the jury inferred murder from all the evidence before it, and chose to disregard those arguments and explanations that would cause reasonable doubt and a finding of innocence. We are of the opinion that there was sufficient evidence to sustain the jury's verdict and to allow the above inferences to be drawn. *People* v. *Russell,* 17 Ill.2d 328.

Prior to the *voir dire* examination of the prospective jurors in this case, the trial judge instructed them on the penalty for murder by reading to them sections 9—1 and 1—7(c) of the Illinois Criminal Code. The defendant maintains that this procedure was improper and prejudicial to his case in that the trial judge "indoctrinated" the jurors on the penalty for murder. We feel that there is no merit in the defendant's criticism of the trial court's action. Juries often have been instructed as to the penalty for the crime charged even in cases where the jury did not have the responsibility of determining the penalty to be imposed. (*Peo-*

*ple* v. *Talbe,* 321 Ill. 80; *People* v. *Papke,* 325 Ill. 410.) In the present case, the jury was charged with the responsibility of determining whether the defendant's penalty should be death. Under these circumstances it would be well to advise the jury either before or during the trial of the alternative to the death penalty.

The judgment of the circuit court of DeKalb County is affirmed.

*Judgment affirmed.*