THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES HORTON, Defendant-Appellant.

First District (1st Division)   No. 60225

Opinion filed October 12, 1976.

James R. Streicker and Rebecca Davidson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

James Horton and Milton Golden were indicted and tried for the murder of Roy McCullough. A jury found James Horton guilty and he was sentenced to a term of 25 to 50 years imprisonment. Milton Golden was found not guilty.

Defendant Horton contends on appeal: (1) that he was not proved guilty of murder beyond a reasonable doubt; (2) that he was not adequately represented by counsel during a stage in the trial when the court issued a deadlock instruction to an undecided jury; and (3) that the sentence is excessive.

The record indicates that on October 28, 1971, at approximately 7 p.m., Roy "Paperman" McCullough, who was 17 years old, joined several friends in an alley behind the 1200 block of South Avers in Chicago, Illinois. Included in the group were: John "Rene" Bennie, who was 16 years old; Carter "Bonnie" Gary, who was 17 years old; Carter's brother, Isaac "Rim" Gary, who was 14 years old; and Michael Proud, who was 16 years old. The group had been playing baseball in an alley for about an hour. The alley was well illuminated by several street lights. At trial, Carter Gary, Isaac Gary and John Bennie rendered substantially the same testimony about the circumstances surrounding the death of Roy McCullough.

Carter Gary left the group and walked to a nearby store to purchase a 16 oz. carton of orange juice. In going back to the alley, Carter Gary saw James Horton and Milton Golden on the porch of a two-flat apartment building located at 1246 South Avers. Carter Gary testified on direct examination that James Horton and Milton Golden were holding shotguns. The first floor apartment of the building was vacant and was used as a hangout for a street gang known as the "Insane Maniac Cobras." Both James Horton and Milton Golden were members of the gang.

At a time prior to October 28, 1971, Milton Golden had asked Carter Gary, Isaac Gary and John Bennie to join the "Insane Maniac Cobras." All three testified that they refused Golden's request and that they were not associated with any street gang. John Bennie testified that his life was

threatened by Milton Golden two nights prior to October 28, 1971, because Bennie refused to join the gang.

Approximately 20 minutes after Carter Gary returned to the baseball game, James Horton and Milton Golden walked in a northerly direction through the alley passing within 20 feet of the group. Horton and Golden were wearing long black "maxi" coats. They walked with a limp in a "stiff-legged" manner. John Bennie observed James Horton duck into a gangway between two garages in the alley. The gangway, which was approximately 30 inches wide, led to a dead end. John Bennie observed Milton Golden walk about 10 feet beyond the garage and turn into a vacant lot adjacent to the alley.

Shortly thereafter, the group finished playing baseball. Roy McCullough walked north through the alley in the same direction which the defendants had gone. The testimony is inconsistent as to the exact placement of the other members of the group at this time. However, the record indicates that Roy McCullough was walking ahead of the Gary brothers, John Bennie and Michael Proud. A shotgun blast erupted from the gangway between the garages and Roy McCullough grabbed the left side of his face and spun around. John Bennie testified that he "pressed up" against the door of one of the garages and the other boys immediately ran in different directions. John Bennie further testified that a second shotgun blast came from the vacant lot and Roy McCullough fell to the ground. John Bennie stated that he observed James Horton step out of the gangway and "fool around" with his shotgun. Horton stepped back into the gangway and a third blast was fired. John Bennie stated that Horton then ran from the gangway carrying a shotgun approximately 2 feet in length. John Bennie stated that he could only see a gun barrel and a "face" in the vacant lot. He could not identify the person in the vacant lot at the time of the shooting.

Isaac Gary and Carter Gary testified that they both ran from the scene after the first shotgun blast. They both heard pistol shots fired after the shotgun blasts. They both testified that they heard just two shotgun blasts. Isaac Gary stated that he went back towards the scene and saw Michael Proud holding the head of Roy McCullough who was lying in the alley. Both Isaac Gary and Michael Proud stopped police cars and directed the police to the scene.

Officers Ronald Wozniak and Henry Bertucci of the Chicago Police Department arrived in the alley at approximately 7:20 p.m. They found a live 12 gauge shotgun shell approximately 10 feet from the body of Roy McCullough. Photographs of the area were taken and introduced into evidence at trial. Roy McCullough was transported to Mt. Sinai Hospital. Photographs revealed that the front and left side of Roy McCullough's

head was inflicted with multiple pellet wounds located in close proximity to each other.

Investigator William Lenz arrived at the alley at approximately 8:30 p.m. The Gary brothers, Michael Proud and John Bennie eventually came to the alley and told Investigator Lenz the same version of the incident which the Carter brothers and John Bennie presented at trial. Lenz observed shotgun blast marks on the walls of the buildings in the alley across from the vacant lot and the gangway. The four boys went to the Maxwell Street Police Station and gave statements to the police.

Neither James Horton nor co-defendant Milton Golden testified in their own behalf. Only Milton Golden called witnesses to testify for the defense.

Michael Proud testified that the group of boys was not playing baseball in the alley behind South Avers on October 28, 1971. He stated that the Gary brothers, Roy McCullough and himself were armed. Everyone was carrying a pistol except Roy McCullough; he was carrying a shotgun. Proud testified on re-direct examination that the group's intention was to shoot members of the "Insane Maniac Cobras."

On cross-examination Proud admitted telling the police on October 28, 1971, substantially the same facts which Carter Gary, Isaac Gary and John Bennie related at trial. Proud also admitted flagging down a police car immediately after the incident. He further testified that the shotgun blast which killed Roy McCullough came from the gangway between the garages. Proud denied on cross-examination that he wanted a reduction in a 90-day sentence, which he was currently serving, in exchange for testifying for the State at trial. However, Proud was impeached by Mr. Neal Walter, an assistant public defender, who testified in rebuttal that Proud wanted a deal on his current sentence before he would testify for the prosecution. The record indicates that Proud related several versions of the shooting incident during different examinations by three counsel.

Earline Miller and Lucretia Ligon testified that they were having coffee at Earline Miller's apartment located at 1224 South Avers. Both witnesses stated that once they heard gunshots, they looked outside to the rear of the apartment building. They saw Milton Golden leaning against a railing. He was not wearing a "maxi" coat, and he was breathing normally. Earline Miller stated that she saw another boy, "Boo" McPherson, running through the alley with a shotgun in his hands.

■■ Upon this record the jury could properly find the defendant James Horton guilty beyond a reasonable doubt. Over 1600 pages of testimony constitutes the record in this case. Carter Gary, Isaac Gary and John Bennie independently presented testimony relating the same account of the killing of Roy McCullough. Their version of the incident at trial was no different from the story which they told police a few hours

after the shooting on October 28, 1971. We find no merit to defendant's argument that their testimony was significantly impeached by statements which they gave at previous hearings and at a previous trial arising out of the same incident. A close examination of the record indicates that the three witnesses' testimony on those prior occasions was substantially the same as their testimony presented in the instant trial. The minor inconsistencies in the witnesses' testimony are insufficient to raise a reasonable doubt of defendant's guilt.

■■ A conviction may be sustained upon circumstantial evidence as well as upon direct. (*People v. Hansen*, 5 Ill. 2d 535, 126 N.E.2d 243.) The jury may draw inferences from the conduct of the defendant. (*People v. McClindon*, 54 Ill. 2d 546, 301 N.E.2d 290.) In the instant case, defendant Horton was seen on the porch of his street gang's hangout with a shotgun about 30 minutes before the shooting. The defendant, accompanied by Milton Golden, was seen walking north in the alley wearing a long "maxi" coat in a "stiff-legged" manner. The defendant was also seen moving into a dead end gangway between two garages. Within minutes, Roy McCullough was fatally wounded by a shotgun blast which was fired from the gangway. Under the street lights of a well-illuminated alley, John Bennie positively identified the defendant when he emerged from the gangway to "fool around" with a shotgun. John Bennie also saw the defendant run from the gangway in escape.

■■ The credible testimony of a single witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification. (*People v. Stringer*, 52 Ill. 2d 564, 289 N.E.2d 631.) A reviewing court in Illinois will not substitute its judgment for that of the finder of fact on questions involving the weight of evidence or the credibility of witnesses, unless the evidence is such as to raise a reasonable doubt of guilt. (*People v. Jones*, 60 Ill. 2d 300, 325 N.E.2d 601.) In this case the testimony of Carter Gary, Isaac Gary and John Bennie was credible. Their version of the shooting was probable. John Bennie rendered a positive identification of the defendant. On the other hand the testimony presented by defense witness Michael Proud was significantly impeached. We believe that the jury carefully and properly discriminated in its evaluation of the evidence presented against both defendants. The jury's finding of guilty against defendant Horton was justified by credible evidence.

■■ We further note that the court instructed the jury on the issue of accountability. (Illinois Pattern Instruction—Criminal No. 5.03.) The accountability instruction incorporates the essentials of section 5—2 of the Criminal Code. (Ill. Rev. Stat. 1971, ch. 38, par. 5—2.) Although the issue of accountability was not raised on appeal by either the defendant or the State, the issue is pertinent to cases involving deaths resulting from

conflicts between street gangs or informal youth groups. (*People v. Tate*, 63 Ill. 2d 105, 345 N.E.2d 480.) The jury could have found from the evidence presented in this case that defendant had "embarked upon a course of action which was dangerous in character and could reasonably be expected to require the use of force that might result in the death of a human being." (*People v. Hughes*, 26 Ill. 2d 114, 120, 185 N.E.2d 834, 837.) It was permissible for the jury to determine that defendant was accountable for the death of Roy McCullough on the basis of the evidence presented.

■■ Defendant's second contention is that he was not adequately represented by counsel at a stage in the trial when the court issued a deadlock instruction to an undecided jury. Four hours after the jury retired to deliberate, the court indicated to counsel and the defendants that the jury was to be sequestered for the evening. The following exchange then occurred:

"THE COURT: Is there any further comment with respect to tomorrow?

MR. MALEK [Counsel for defendant Horton]: Judge, I ask Mr. Horton if it's okay to excuse my presence tomorrow at the time the jury comes back with their verdict. He indicated he would. So, Mr. Nixon will stand in my stead when the verdict is returned, is that okay?

THE COURT: Yes.

DEFENDANT HORTON: Yes.

MR. NIXON: And, Mr. Malek, do you want me, if there should be an adverse finding as to your client, to poll the jury on your behalf and his behalf.

MR. MALEK: Sure, please.

THE COURT: Very well."

The jury deliberated the entire following day. At approximately 4:20 p.m. the court called a conference to consider the situation. The court noted:

"Mr. Malek last night did state on the record that Mr. Nixon was to represent his client today.

He did appear here earlier today, but I told him I would call a meeting at approximately 3:30 or somewhere in there and he has not been back since."

The court asked counsel if any statements should be made to the jury. Mr. Nixon replied, "Your Honor, I do not request that any statement be made to the jury on behalf of Mr. Golden and on behalf of Mr. Horton." The prosecution requested that the deadlock instruction from *People v. Prim*, 53 Ill. 2d 62, 289 N.E.2d 601, be read to the jury. Mr. Nixon

objected, stating that such an instruction would be read "over my objection and over the objection of Mr. Malek."·

Without indicating the reason for the jury's indecision, the foreman informed the court that the jury was deadlocked. Mr. Nixon objected to the court's suggestion of declaring a mistrial. Mr. Nixon urged the court to allow further jury deliberation without the issuance of the deadlock instruction. However, the court issued the deadlock instruction. A few hours later, the jury returned its verdicts finding defendant Horton guilty of murder and co-defendant Golden not guilty. On behalf of defendant Horton, Mr. Nixon asked that the jury be polled. Mr. Nixon further stated:

> "MR. NIXON: May I make an oral motion for Mr. Malek?
> THE COURT: Yes.
> MR. NIXON: At this time I would move for a new trial on behalf of James Horton and in arrest of judgment."

The record clearly indicates that Mr. Malek delegated full responsibility to Mr. Nixon for the representation of defendant Horton. It is also apparent from the record that defendant Horton knowingly consented to representation by Mr. Nixon. The conduct of Mr. Nixon indicates that he spoke on behalf of both defendants during the discussion about the jury deadlock. It is speculative to suggest that Mr. Malek would have represented defendant Horton differently than Mr. Nixon at the point of the jury's deadlock. The court considered all the possible courses of action available to it at the deadlock juncture. The facts in the record show that defendant Horton was fully represented. We find no conflict of interest, nor do we find any prejudice resulting to defendant from Mr. Nixon's representation.

■■ Defendant contends that his sentence of 25 to 50 years imprisonment is excessive. A proper objective in determining the extent and nature of a criminal penalty is the restoration of the offender to useful citizenship. (Ill. Const. 1970, art. I, §11; *People v. Simmons*, 60 Ill. 2d 173, 326 N.E.2d 383.) At the time of the offense, the defendant was 17 years of age and had no prior criminal record. The sentence imposed severely diminishes the possibility of defendant's rehabilitation. (*People v. Ike*, 7 Ill. App. 3d 75, 286 N.E.2d 391; *People v. Wilkins*, 36 Ill. App. 3d 761, 344 N.E.2d 724.) Pursuant to the authority granted this court under Supreme Court Rule 615(b)(4), we modify the sentence to a minimum term of 14 years and a maximum term of 25 years. (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4).) The judgment is affirmed as modified.

Judgment affirmed as modified.

SIMON and O'CONNOR, JJ., concur.