THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHRISTOPHER RICKARD, Defendant-Appellant.

First District (2nd Division)    No. 80-719

Opinion filed September 1, 1981.—Rehearing denied October 1, 1981.

James J. Doherty, Public Defender, of Chicago (Matthew J. Beemsterboer and Richard S. Schiffrin, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, George M. Velcich, and Harry John Devereux, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Defendant Christopher Rickard was charged by indictment with the armed robbery and murder (Ill. Rev. Stat. 1977, ch. 38, pars. 18—2 and 9—1) of Richard Worel. A jury found defendant guilty of murder, and he was subsequently sentenced to a term of 100 to 300 years. Defendant asks this court to determine (1) whether the circuit court erred when it admitted evidence of and permitted comment upon (a) certain post-arrest statements by defendant and (b) two rifles found at defendant's residence, and (2) whether defendant's sentence is excessive.

Testimony at trial indicates defendant and Worel worked in an engineering department of Zenith Radio Corporation. Worel, the leader of a group including defendant, recommended to defendant's supervisor that defendant be included among those personnel to be laid off by the company. Defendant was laid off in the fall of 1977.

On January 31, 1978, defendant drove his Chevrolet Blazer to the company parking lot at about 5 p.m. Employees were leaving work. Defendant parked near Worel's automobile and waited for him. When Worel arrived, the two conversed about defendant's difficulty in securing suitable employment. Defendant apparently believed Worel gave unfavorable recommendations concerning defendant's applications for employment. Worel said he could be of no help to defendant. Both men entered their cars and drove out of the lot.

Several minutes later defendant saw Worel driving southbound on Harlem Avenue approximately two traffic lights north of the intersection of Lake Street. After defendant indicated his desire to talk further, the two drove their cars into a nearby condominium parking lot and parked. They talked through their open car windows until it became too cold to continue. At that time Worel entered defendant's vehicle.

The details of the subsequent events are disputed. Police Investigator Schak testified defendant told him that Worel began to joke and make light of defendant's predicament. Worel told defendant the latter was a poor worker and there was no way Worel could help him. Defendant then pulled out a .22-caliber automatic pistol to show Worel he "meant

business." Defendant wanted a good recommendation, some help in locating a job, and some assistance with his bills. Worel continued to make light of the situation. Defendant then shot Worel, drove out of the parking lot, and went to his residence in Chicago, taking Worel's body with him.

Defendant testified at trial that on the afternoon of January 31, he was traveling to the Wieboldt's department store at Lake and Harlem Avenue to purchase a calculator. He stopped at the Zenith parking lot to see either his former supervisor or Worel. Once inside the lot he decided he would wait near Worel's car. The two men engaged in conversation for a short period of time and then departed. Defendant stated he coincidentally saw Worel north of the Lake Street intersection and the two then proceeded to a parking lot. Worel entered defendant's car to escape the cold. Once inside, Worel noticed a pistol located in the plastic tray under the vehicle's windshield, and he asked to see it. Defendant then picked it up and held it in his hands as Worel fingered it. During the next 20 minutes, defendant held the gun while they talked about his need for references. As the conversation ended, defendant became frustrated with his lack of success in gaining a commitment from Worel. Worel rose from where he had been sitting to leave the car. He hit his head and, according to defendant, lost his balance. Worel fell toward the gun and knocked it out of defendant's hand. During direct testimony defendant stated the gun discharged toward Worel when it hit the floor of the vehicle. On cross-examination defendant stated the gun went off while it was still in his hands. Worel fell to the floor. Defendant testified he panicked and drove around in a stupor for two hours before he arrived at his residence, a rented garage containing space for a house trailer, workshop, and the vehicle. When he opened the Blazer's tailgate, decedent fell out. Decedent's wallet and his paycheck fell clear of the body. Defendant dragged the body to the side of the vehicle and placed plastic garbage bags containing debris upon it. He then began drinking and became intoxicated for three days.

Additional testimony at trial reveals defendant attempted to cash decedent's paycheck at a nearby currency exchange. The exchange employee notified Zenith, and they in turn contacted the Chicago police, who began a missing persons investigation the same day.

Police Officer Angela Schreiner testified she approached defendant at the location of his new employer on February 7, 1978. Defendant stated he had last seen Worel in November of 1977. When defendant admitted he owned a Blazer, Schreiner told him the vehicle had been seen in a condominium parking lot next to Worel's abandoned car. Defendant then stated to her that he had seen Worel the previous Tuesday. Defendant was advised of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Defendant then told Schreiner he had

talked with Worel in the parking lot that evening, but that Worel drove off after their conversation. Defendant was placed under arrest for the theft of decedent's paycheck. *Miranda* warnings were again given. Schreiner then asked defendant where the Blazer was. She testified defendant said, "I won't tell you." Defense counsel objected. She then testified he gave the same answer in response to her inquiry as to where he lived. Defense counsel objected again.

Other investigators followed leads to defendant's residence. When they arrived at the garage, the odor of decaying flesh was evident. Decedent's body was covered with filled garbage bags. Four pieces of lumber measuring 7 by 3 feet and two pieces measuring 3 by 3 feet were found near the body. Six bags of ready to mix cement were found in the rear of the Blazer. The investigators also found bullets, expended shell casings, an automatic pistol, and two rifles on the premises. Defendant was confronted with these findings at the police station. He admitted he shot decedent more than once and brought the body to his residence.

Examination of decedent's body revealed he had been shot three times. One bullet pierced his heart. It came from defendant's automatic pistol. Two other bullets, however, did not match any of the three weapons found in the garage. Defendant testified he owned five weapons other than the .22-caliber pistol.

## I

Defendant raises two issues regarding the admissibility of certain evidence during trial. He contends the assistant state's attorney's comments upon this evidence prejudiced his case and, he concludes, a new trial is warranted.

## A.

■■ First, defendant claims the statement, "I won't tell you," is consistent with the exercise of his rights afforded under the fifth amendment and amounts to a desire to remain silent during police questioning. We disagree. Defendant made the statement twice in response to questions regarding the whereabouts of his car and where he lived. The responses were made after defendant had answered various questions regarding his previous contact with the decedent. He answered subsequent questions as well. After considering the entire colloquy, we believe defendant was refusing to answer two pertinent questions rather than expressing a desire to remain silent. In fact, the defendant never expressed an unwillingness to talk. The colloquy in question did not take place in the police station nor is there any claim of coercion or duress. Prior to each series of questions and answers, defendant was given a *Miranda* warning. He indicated he understood its meaning. We believe a more positive mani-

festation of a desire to invoke the protections of the fifth amendment is required under these circumstances. See *People v. Krueger* (1980), 82 Ill. 2d 305, 310-12, 412 N.E.2d 537 (singular statement "Maybe I need a lawyer" insufficient to invoke Fifth Amendment protections where accused responded positively to all other questioning).

■■ Furthermore, even if we assume defendant's contention has merit, we believe that evidence of his statements did not contribute to his conviction. (See generally *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287, 362 N.E.2d 681.) The record discloses overwhelming evidence of defendant's guilt. We therefore conclude that admission of the statement was harmless beyond a reasonable doubt. See *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Green* (1979), 74 Ill. 2d 444, 451-52, 386 N.E.2d 272; *People v. Beller* (1979), 74 Ill. 2d 514, 525, 386 N.E.2d 857; *People v. Mitchell* (1975), 35 Ill. App. 3d 151, 160, 341 N.E.2d 153, *appeal denied* (1976), 63 Ill. 2d 561.

## B.

■■ Defendant also complains that the admission of evidence of his two .22-caliber rifles at trial was not relevant to the offense for which he was tried. No evidence linked the bullets found in decedent's body with either rifle. Since the two rifles were unconnected to the instant offense of murder, they do not make it more or less likely that defendant is guilty. Admission of this evidence was erroneous. See, *e.g.*, *People v. Wade* (1977), 51 Ill. App. 3d 721, 729-30, 366 N.E.2d 528, *appeal denied* (1977), 66 Ill. 2d 641.

Although evidence regarding the two rifles was erroneously admitted, we are satisfied beyond a reasonable doubt that this evidence did not contribute to defendant's conviction. (See generally *People v. Knippenberg*.) This case presents overwhelming evidence of defendant's guilt. We therefore conclude that the error complained of was harmless.

## II

Defendant contends that his sentence is excessive, unduly harsh, and fails to comport with the objective of restoring offenders to useful citizenship. In support of this argument, defendant notes that prior to the present circumstances, he had no criminal history whatsoever. He also points out his honorable discharge from the British Army, his educational background (engineering degree), and his employment history.

■■ Our constitution mandates that all penalties be determined according to both the seriousness of the offense and the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, §11.) Here, defendant, age 32 at the time of the offense, was sentenced to a term of 100 to 300 years. While we recognize that the crime of which he was

convicted, murder; is the most serious offense, we believe that the sentence imposed effectively negates any possibility of defendant's rehabilitation. (See *People v. Horton* (1976), 43 Ill. App. 3d 150, 157, 356 N.E.2d 1044.) We recognize that in other circumstances, the rehabilitation factor might not be entitled to as much weight. (See *People v. Larsen* (1977), 47 Ill. App. 3d 9, 31-32, 361 N.E.2d 713, *aff'd* (1979), 74 Ill. 2d 348, 385 N.E.2d 679, *cert. denied* (1979), 444 U.S. 908, 62 L. Ed. 2d 143, 100 S. Ct. 220 (defendant with extensive prior felony record).) Here, however, we do not feel that this factor was accorded proper consideration in the sentencing decision. In sum, we must view the sentence entered by the trial court as an abuse of discretion. We therefore vacate the sentence entered and remand the case to the trial court solely for the purpose of resentencing defendant in conformance with our constitution's directives, pertinent statutes, and case law.

Conviction affirmed; sentence vacated; case remanded for resentencing.

HARTMAN, P. J., and STAMOS, J., concur.