THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROOSEVELT LANDGHAM, Defendant-Appellant.

First District (2nd Division)   No. 1—86—0637

Opinion filed April 11, 1989.

Michael J. Pelletier and Bruce Mosbacher, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Christine Perille, Special Assistant State's Attorney, and Inge Fryklund and Judy L. Groeneveld, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder, and, after the judge held a death penalty hearing without a jury, he was sentenced to natural life imprisonment. He appeals, arguing that (1) the trial court erred in refusing to accept his pretrial waiver of a death penalty jury, in refusing to "life qualify" the jury, and in questioning the jury pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770; (2) the trial court erred in allowing Dwight Moore to testify about an alleged sexual attack by defendant and in allowing testimony regarding the defendant's statement made while in custody; (3) the prosecutor's remarks during closing argument denied defendant his right to a fair trial; and (4) the trial court erred in refusing to submit an involuntary manslaughter instruction to the jury.

Artie Williams testified that on May 2, 1984, she helped her 10-year-old son, Jammie, get ready for school and gave him a key to their apartment since she would be doing errands when he returned home from school. When she arrived home that evening and discovered that Jammie was not in the apartment, she made a tour of the neighborhood for him, but without result, and then reported to the police that he was missing.

Jammie's body was discovered the next day on a platform behind a store near Lexington and California Avenues in Chicago. Dr. Robert Stein, the chief medical examiner of Cook County, testified that he

was called to the scene, where he observed that Jammie was lying on his left side, with his right leg bent at the knee, that he was fully dressed, and that there were abrasions and contusions on his face and neck. Dr. Stein conducted an autopsy, which revealed injuries to Jammie's face, neck, chest, elbow, knee and the left side of his body. The internal examination revealed chest hemorrhages, lacerations in the lungs, hemorrhage in the mediastinum and injuries to the outer portion of the heart. Dr. Stein determined that the cause of death was a "compression injury causing a result of blunt injury and the manner of death, homicide." He further testified that such cause of death was compatible with being beaten with a table leg and that there was no evidence of a sexual assault.

Jay Link, Jammie's 11-year-old friend, testified that in the early evening of May 2, 1984, he and Jammie were playing in front of their apartment building, when defendant, who lived nearby, called them over to do some exercises. The boys crossed the street, but Jay's mother called him to come home, so he left while Jammie was talking with defendant.

Robert Armstead, 14 years old at the time of trial, testified that in late April 1984 defendant asked him if he wanted to make some money by helping him provide exercises for children. Robert and his friend went to Douglas Park with defendant and began doing push-ups, and while they were doing so, defendant touched them at the waist. No children showed up for the exercise class; hence, after a 10-minute wait Robert and his friend left. Defendant asked them to return the next afternoon, but the boys did not go back.

Over a defense objection, the State called Dwight Moore, an 11-year-old friend and neighbor of Jammie's. On the Monday of the week that Jammie disappeared, Dwight had gone to see defendant because defendant had told him he could make money tumbling. Defendant took him inside a church in the neighborhood and told him to take off his clothes. When Dwight refused, defendant pulled his pants down and felt his "privates," but as soon as defendant heard a knock on the door he told Dwight to put his clothes on and warned him, "If you tell anyone, I'll kill you." Dwight did not tell anyone about this incident until he spoke with the police six weeks later.

The police arrested defendant on June 12, 1984, and advised him of his rights before questioning him. Defendant denied holding exercise classes and denied knowing either Dwight or Jammie, whereas in a previous interview, on June 3, 1984, defendant told the police that he did know Jammie. When asked about going to the church with Dwight, he stated, "I don't want to talk about that."

The next day defendant was given a polygraph test by John Stout. At trial the jury was told that Stout was a civilian employee of the police department who had interviewed defendant. Defendant at first told Stout that he did not know Jammie, but that he had seen his picture in the paper; yet, later, he told Stout that he had seen Jammie and suspected that he was buying dope for his brother. He followed Jammie into a building and saw him fall, after which defendant went home.

After talking with Stout, defendant told a similar story to Officer Keane, but when Keane pointed out to him that his story contained discrepancies, defendant responded that he would now tell the truth and proceeded to give Keane yet another version of the incident. He claimed that Jammie came to the church to show him some flips, and after one particular flip, he landed on his head and broke his neck. Defendant then carried him to the landing where he was later found. After Keane informed defendant that Jammie did not suffer a broken neck, defendant again said he was going to tell the truth and rendered still another version of the occurrence.

Keane then contacted Assistant State's Attorney Vroustouris, who interviewed defendant and wrote out his statement. In his statement defendant related that Jammie was interested in exercise classes and wanted to show defendant how good he was. Jammie went to Solid Rock Number 2 Baptist Church at 742 South California in Chicago with the defendant and started doing exercises. While defendant was holding Jammie's leg so he could try a flip, he lost his footing and both he and Jammie fell. Defendant got up and turned Jammie over and noticed blood in his mouth. He shook Jammie but because he did not respond, defendant thought he was unconscious though not dead. Defendant then picked up a piece of a metal and wood table leg approximately 2½ feet long and struck Jammie in the chest and the back of the neck. He then carried him to a porch near the church because he knew he had done "something bad" and did not want to get caught.

After he was found guilty of murder, defendant executed a written waiver of jury for the death-sentencing proceedings, and having heard arguments on both aggravation and mitigation, the trial judge sentenced defendant to natural life imprisonment without parole.

OPINION

Defendant first argues that the trial court erred in allowing the jury to be death qualified, or "Witherspooned," thus depriving him of his right to a fair trial by an impartial jury. Prior to trial defendant

attempted to waive his right to a jury for sentencing at a death penalty hearing, but the judge refused to accept the waiver, ruling that it was premature because it would not be binding if defendant changed his mind about it after trial.

■ The Illinois Supreme Court has held that a trial court must accept a pretrial waiver of a jury for death-sentencing proceedings if that waiver is knowing and voluntary (*People v. Erickson* (1987), 117 Ill. 2d 271, 513 N.E.2d 367; *Daley v. Hett* (1986), 113 Ill. 2d 75, 495 N.E.2d 513); however, that ruling is not retroactive. (*People v. Erickson* (1987), 117 Ill. 2d 271, 513 N.E.2d 367.) Defendant's trial began in January 1986, while *Daley v. Hett* was not decided until June 1986. Moreover, in *Erickson,* the court held that the trial court's refusal to accept a sentencing jury waiver before trial and the consequent death qualification of a jury did not entitle the defendant to a new trial. (117 Ill. 2d at 291-92.) Although defendant is aware of the *Erickson* decision, he argues that it was decided incorrectly. That contention, it goes without saying, cannot be given residence in this court.

■ Defendant next maintains that he was denied his right to an impartial jury because a death-qualified jury is conviction prone, citing studies accepted by the court in *Grigsby v. Mabry* (8th Cir. 1985), 758 F.2d 226, *rev'd sub nom. Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758. In reversing the Eighth Circuit, however, the Supreme Court found that under the facts presented, death qualifying the jury did not violate the fair–cross-section requirement of the right of an accused to a trial by an impartial jury. But defendant claims that that decision is not controlling in the instant case, because *Lockhart* was "premised on the assumption that the same jury would decide both guilt or innocence and whether the death penalty would be imposed." See 476 U.S. at 165, 90 L. Ed. 2d at 142, 106 S. Ct. at 1760.

Our supreme court, on the other hand, has made *Lockhart* conclusive on the issue as follows:

> "We next address defendant's argument that qualification of the jury pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, denied him his right to a jury drawn from a fair cross-section of the community and resulted in a conviction-prone jury. The Supreme Court has recently rejected in *Lockhart v. McCree* [citation] a challenge to the qualification of jurors under *Witherspoon* on precisely the same grounds as defendant now raises. Our decisions are in harmony with *Lockhart* and therefore need not be reconsidered. The qualification of jurors under *Witherspoon* does not

deny a defendant the right to a jury drawn from a fair cross-section of the community [citations], nor does it result in a conviction-prone jury." (*People v. Johnson* (1986), 114 Ill. 2d 170, 207, 499 N.E.2d 1355, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618.)

We note that in *Johnson,* as in the instant case, defendant waived his right to a jury at the death penalty hearing and was therefore sentenced by the trial judge.

Moreover, the studies relied upon by the Eighth Circuit in *Grigsby v. Mabry* have been rejected by Illinois courts:

"Defendant contends that Witherspooning the jury venire resulted in a jury which was biased in favor of prosecution and which failed to represent a fair cross-section of the community. Our supreme court rejected the 'conviction-prone jury' argument in *People v. Lewis* (1981), 88 Ill. 2d 129, 147, 430 N.E.2d 1346, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307. The court reaffirmed its holding in *Lewis* in *People v. Tiller* (1982), 94 Ill. 2d 303, 321-22, 447 N.E.2d 174, and *People v. Free* (1983), 94 Ill. 2d 378, 401, 447 N.E.2d 218. The court has also rejected the argument that Witherspooning results in an unrepresentative jury. (See *People v. Free* (1983), 94 Ill. 2d 378, 401-02, 447 N.E.2d 218.) Defendant submits, however, that the decision in *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, warrants a reversal of the law as set forth by the highest court in that [*sic*] State. *** [T]hese studies were all available to our supreme court at the time that *Lewis, Tiller* and *Free* were decided, and presumably the court was aware of their existence but unpersuaded. In any event, in light of our supreme court's clear pronouncements on the issues raised by defendant, we refuse to follow the holding in *Grigsby.*" *People v. Smith* (1984), 127 Ill. App. 3d 622, 636, 469 N.E.2d 634.

Furthermore, in holding that *Daley v. Hett* is not retroactive, the supreme court stated that a "Witherspooned" jury is presumed to be impartial.

"It is clear as well that, unless the defendant can demonstrate that the death questioning of prospective jurors produced an unfair jury, he would fare no better if we were to hold *Hett* retroactive. It is well established that a jury questioned regarding imposition of the death penalty is presumed to be a fair jury on the issue of guilt or innocence." (*Erickson,* 117 Ill. 2d at 292.)

Here defendant has not overcome the presumption that the jury was impartial; thus, he has not shown that he was denied a fair trial.

■■ The next issue defendant raises is that the trial court erred in failing to "life-qualify" the jury by asking questions that would identify those jurors who would automatically vote to impose the death penalty if they convicted the defendant of murder. Defendant fails to cite any authority in support of his contention that the judge should have so conformed, other than the studies used in *Grigsby v. Mabry* which conclude that those who favor the death penalty are more likely to convict—a theory to which our courts, as we noted above, have already denied sanctuary.

As discussed previously, Illinois courts have rejected the argument that death-qualified juries are conviction prone. In addition, the supreme court has held that there is no need to "life-qualify" a jury.

> "As we have held previously, there is no 'reverse *Witherspoon*' rule that requires the trial court to 'life qualify' a jury to exclude all jurors who believe that the death penalty should be imposed in every murder case. [Citations.] A defendant, however, is free to question the jurors regarding bias, and it is then for the trial court to decide whether to excuse a juror for cause." (*People v. Brisbon* (1985), 106 Ill. 2d 342, 359, 478 N.E.2d 402.)

Defendant's conviction must be affirmed on this issue.

■■ Defendant's next contention is that the trial court erred in denying his motion *in limine* to prevent Dwight Moore from testifying about an alleged sexual attack by defendant. He maintains that there was no evidence that Jammie had been sexually assaulted and therefore the evidence was not probative of any issue in the case. He also claims that the trial court failed to consider the substantial prejudice resulting from this testimony.

In denying defendant's motion as to Dwight Moore, the trial court stated:

> "The court considers that the State's theory is—is that sex was involved, although no acts of sex appear to have been committed against the victim.
>
> Dwight Moore made a statement where he indicated that he, too, was involved in exercise classes and was told to undress, and then there was some fondling, and then a knock at the door, and the defendant told him, in respect, to keep his mouth closed or he—or else he would be killed. And the State argues in that instant .[sic] that it is admissible of another crime, that it shows the motive for him killing the deceased.

The State does not have to prove a motive, but if the State proceeds on a theory of a motive, then the State is obligated to prove that. The Court also considers that the time period, the two-day time period, and the circumstances of the Dwight Moore matter as compared to the circumstances of the—of the killing of the decedent in this case, and *** [a]lthough it is a different crime, it is admissible on the matter of motive.

The Court also considers that the defendant's statement relative to the incident involving the deceased, does have within it, if that's—if that statement is to be believed, some exculpatory representations. The principal one is that the—whether it be true or not—it is that the victim had fallen and was unconscious, although he was still alive. Would he have survived? If this were so, would he have died—if this were so?

The Court does not know. Was it accident? The Court does not know. The State says it was not. Is it another crime where a person has been involved—where the defendant has threatened that person after sex circumstances became involved? Is that admissible on this?

The Court thinks that it is."

In making its decision, the trial court relied on *People v. Dewey* (1969), 42 Ill. 2d 148, 246 N.E.2d 232. In that case, the defendant testified that the victim was struck as she ran in front of his car, and that he placed her in his car, intending to take her to a hospital; but, when he realized she was dead, he disposed of her body. The trial court allowed evidence that defendant had previously attempted to pick up girls of the same age as the victim, and the supreme court affirmed.

"Evidence which tends to prove a fact in issue is admissible even though it discloses that the defendant committed another crime, and evidence which establishes motive, intent, identity, accident or absence of mistake is admissible even though it may also involve proof of a separate offense. [Citation.] Also evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime. [Citation.] In this case, the evidence complained of did not constitute a criminal offense. Throughout the trial, the defendant claimed that he had accidentally struck Susan Brady with his car when she darted in front of him, and that he put her in his automobile after she was injured for the purpose of taking her to a hospital. Whether Susan died by accidental or criminal means was a question of fact for the jury, and the evidence under consider-

ation was probative of that fact and therefore admissible on the authority of the cases cited above." 42 Ill. 2d at 157.

In the instant case, the State contends that Dwight Moore's testimony was proper to show motive and to disprove the theory of an accident. It maintains that the trial court properly exercised its discretion, as is evidenced by the fact that it did not allow proof of defendant's 1966 murder conviction, which was also the subject of his motion *in limine*. We find that the testimony regarding defendant's sexual assault on Dwight Moore was probative of whether Jammie died by accidental or criminal means; it was therefore properly admitted. (R. Ruebner, Illinois Criminal Trial Evidence ch. 2, at 38-39 (1986).) Besides, the trial court gave proper consideration to the factor of whether the prejudicial effect of such evidence substantially outweighed its probative value; accordingly, we hold that he did not abuse his discretion in ruling it admissible. (R. Ruebner, Illinois Criminal Trial Evidence 41 (1986).) Defendant's conviction is affirmed on this issue.

■ ■ Defendant next advances the argument that his fifth amendment right to remain silent was violated by Detective Keane's testifying to defendant's statement that he didn't "want to talk about that," made in response to a question about his taking Dwight Moore to a church. He further contends that the State violated Supreme Court Rule 412(a)(ii) (107 Ill. 2d R. 412(a)(ii)) by failing to tender this statement to him pursuant to a proper request. Rule 412(a)(ii) provides in part as follows:

"[T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control: *** (ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." 107 Ill. 2d R. 412(a)(ii).

The State responds that defendant did not immediately object to Keane's testimony, nor did he ask for a continuance; had he done so, the court could have sustained the objection or instructed the jury to disregard the remark. (*People v. Jackson* (1981), 84 Ill. 2d 350, 359, 418 N.E.2d 739.) Instead, defense counsel moved for a mistrial after the questioning had proceeded to another topic. The trial judge determined that declaring a mistrial was an inappropriate sanction for the State's failure to tender defendant's statement in response to his request for discovery, and a reviewing court will not disturb the exercise of a trial court's discretion in determining a sanction absent a

showing of surprise or prejudice. (*People v. Loggins* (1985), 134 Ill. App. 3d 684, 691, 480 N.E.2d 1293.) The State further contends that defendant was not invoking his right to remain silent when he declined to answer a question regarding Dwight Moore, relying on *People v. Rickard* (1981), 99 Ill. App. 3d 914, 425 N.E.2d 1317:

> "First, defendant claims the statement, 'I won't tell you,' is consistent with the exercise of his rights afforded under the fifth amendment and amounts to a desire to remain silent during police questioning. We disagree. Defendant made the statement twice in response to questions regarding the whereabouts of his car and where he lived. The responses were made after defendant had answered various questions regarding his previous contact with the decedent. He answered subsequent questions as well. After considering the entire colloquy, we believe defendant was refusing to answer two pertinent questions rather than expressing a desire to remain silent. In fact, the defendant never expressed an unwillingness to talk. The colloquy in question did not take place in the police station nor is there any claim of coercion or duress. Prior to each series of questions and answers, defendant was given a *Miranda* warning. he indicted he understood its meaning. We believe a more positive manifestation of a desire to invoke the protections of the fifth amendment is required under these circumstances." (99 Ill. App. 3d at 917.)

In the instant case, the facts regarding the statement at issue are congruent with those in *Rickard*: although defendant was being held at the police station when he declined to answer the question, he was given his *Miranda* warnings, and he makes no claim that he did not comprehend those warnings or that he was coerced or under duress. Then, too, of the many questions he was asked about the victim, and the circumstances surrounding the offense about which he was interrogated, defendant refused to answer only the inquiry concerning Dwight Moore; hence, it is reasonable to conclude that he was not expressing a desire to remain silent. We therefore hold that defendant's argument is without merit.

■■■ Defendant next claims that he was denied a fair trial when the judge refused to instruct the jury on involuntary manslaughter. He maintains that he struck Jammie with a table leg after finding him unconscious in a "reckless attempt to revive him," and that there was evidence presented that the killing was unintentional.

A defendant is entitled to a manslaughter instruction if there is evidence in the record that would reduce the crime from murder to

manslaughter. (*People v. Foster* (1987), 119 Ill. 2d 69, 87, 518 N.E.2d 82, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044; *People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696.) A person commits involuntary manslaughter if he "unintentionally kills an individual without lawful justification *** if his acts, whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) It is not necessary to show that the defendant deliberately formed an intent to kill in order to sustain a conviction; rather, it is enough to imply the intent to murder by showing the voluntary and willful commission of an act, the direct and natural tendency of which is to destroy another's life. *People v. Evans* (1981), 92 Ill. App. 3d 874, 879, 416 N.E.2d 377; *People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.

Here, the trial judge said all that needs to be said on this subject when he found that "there's no evidence in this case that is such—is such that it raises the issue of involuntary manslaughter." We are constrained to add, however, that defendant's assertion that he beat a 10-year-old boy with a 2½-foot-long table leg as he lay bleeding from the mouth in order to revive him in light of the uncontroverted evidence of an autopsy which showed external injuries over virtually every part of his body plus multiple hemorrhages and other internal injuries, to say nothing of the manifold contradictory statements he made to the police, resonates no better in our ears as evidence warranting a manslaughter instruction than it did in those of the trial judge; we accordingly hold that the trial judge's ruling on this issue was proper.

■■ ■ Finally, defendant contends that he was denied a fair trial by the prosecutor's improper remarks during opening and closing argument when the State referred to defendant as "every mother's nightmare," and repeatedly stated that the "story" the jury was about to hear was "every mother's nightmare." The State also called defendant a "con man," and, although there was no evidence thereof, it argued that he had sexually attacked Jammie.

"[T]his sneering man is responsible for the death of Jammie Williams because he was doing to Jammie the same things that two days earlier he did to little Dwight."

Defendant claims these errors were compounded when the trial judge sustained several objections to "proper arguments" made by defense counsel during her closing argument.

The State responds that a prosecutor is allowed great latitude during closing argument and, absent an abuse of discretion, the deter-

mination of the trial court as to the propriety of closing argument should be upheld. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847.) It maintains that the prosecutor's remarks were proper comment on the evidence and that they were clearly warranted as natural inferences that can be reasonably drawn therefrom, as is evidenced by defense counsel's also referring to the plight of the victim as a mother's nightmare, when she stated:

> "We are certainly not denying that. It is indeed, the story of the whole community's nightmare. A terrible thing happened to Jammie Williams. The evidence will show you that clearly."

The State also contends that, if, *arguendo,* these comments were improper, they did not substantially prejudice defendant because they were objected to at trial and the court sustained the objections. *People v. Trolia* (1982), 107 Ill. App. 3d 487, 437 N.E.2d 804, *cert. denied* (1983), 460 U.S. 1044, 75 L. Ed. 2d 798, 103 S. Ct. 1442.

We quite agree with the arguments made by the State. Moreover, the evidence against the defendant was as massive as it was appalling, leading irresistibly to the conclusion that he was guilty beyond any reasonable doubt. Accordingly, we hold that the prosecutor's remarks could not have been a material factor in defendant's conviction.

For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BILANDIC, P.J., and EGAN,* J., concur.

---

*Judge Egan participated in the decision of this case prior to becoming a member of the sixth division.