(No. 59058.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PAUL S. ERICKSON, Appellant.

*Opinion filed April 2, 1987.—Modified on denial of rehearing October 5, 1987.*

274

GOLDENHERSH, J., took no part.
SIMON, J., and CLARK, C.J., dissenting.

G. Joseph Weller, Deputy Defender, of Elgin, and Theodore A. Gottfried, State Appellate Defender, of Springfield (Kyle Wesendorf, of Chicago, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., Kevin Sweeney and Lynn M. Egan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Paul Erickson, was charged by information filed in the circuit court of Cook County with the murder of Elizabeth Launer. The information contained

additional charges stemming from the incident, for a total of 10 counts. Count one of the information charged intentional murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)); count two charged knowing murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(2)); count three charged felony murder predicated upon rape (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3)); count four charged rape (Ill. Rev. Stat. 1981, ch. 38, par. 11—1); count five charged unlawful restraint (Ill. Rev. Stat. 1981, ch. 38, par. 10—3); count six charged concealment of a homicidal death (Ill. Rev. Stat. 1981, ch. 38, par. 9—3.1); counts seven through ten charged armed violence predicated upon the prior counts of knowing murder, felony murder, rape, and unlawful restraint, respectively (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2).

Defendant pleaded not guilty. The State indicated that it would seek the death penalty in the event the defendant was convicted of murder. Before the commencement of trial, the defendant attempted to waive his right to a jury to consider imposition of the death penalty if he were convicted of murder. The court refused defendant's waiver. Defendant then elected to be tried by a jury. At the conclusion of trial, the jury returned general verdicts of guilty on all counts.

Defendant again tendered a waiver of the sentencing jury which was accepted. The sentencing hearing then commenced before the court pursuant to section 9—1(d)(3) of the death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)(3)). At the conclusion of the proceeding, judgment was entered on the convictions for murder and concealing a homicidal death. The court merged the conviction of unlawful restraint into the rape conviction and entered judgment thereon. No judgment was entered on the armed-violence counts. The court then sentenced the defendant to death for murder; an extended term of 60 years for rape (Ill. Rev. Stat. 1981, ch. 38,

par. 1005—8—2); and a consecutive term of 10 years for concealment of a homicidal death (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—4(b)). Because the death penalty was imposed, the cause comes directly to this court for review pursuant to Supreme Court Rule 603 (87 Ill. 2d R. 603).

We set forth below only those facts necessary to decide the issues defendant raises before this court.

Testimony given during the State's case in chief established that the body of Elizabeth Launer was found in a retention pond in Rolling Meadows, Illinois, on August 4, 1982. Preliminary examination of the body revealed two stab wounds, one in the chest and one in the abdomen.

Testimony proffered by the State also established that, on the evening of July 30, 1982, the defendant, at the request of a former girlfriend, Lisa Soderberg, provided his car, bought alcoholic beverages, and rented a motel room at the Rolling Meadows Holiday Inn for a group of five juveniles. The group consisted of Soderberg, Thomas Fairweather, Michael Blanchard, Renee East and the victim, Elizabeth Launer. Later in the evening, East left the motel, leaving the defendant and four juveniles in the room.

Fairweather, testifying for the State, stated that, at approximately 11:30 p.m., the defendant approached him, walked with him outside, and asked whether or not he could keep his "mouth shut" if he knew about a bad crime. Fairweather answered in the affirmative and asked what kind of crime. Fairweather stated that the defendant referred to rape and indicated that he wanted to have sex with Launer. According to Fairweather, defendant said that he would rape her if she did not cooperate with his advances.

Fairweather further testified that he expressed concern about Launer's reporting the rape to the police.

The defendant allegedly replied that, after the rape, they would kill her. According to Fairweather, the defendant displayed a knife which he took from underneath the front driver's seat of his car. He also showed Fairweather two neckties and a "rolled up, folded over sock."

Fairweather continued, testifying that the defendant then approached him and Blanchard with the following plan. It would be necessary for Soderberg to leave. According to Fairweather, the defendant suggested that Fairweather provoke an argument with her so that she would get angry and depart. Fairweather testified that the defendant then gave the two ties to Blanchard and the sock to him.

Fairweather stated that the defendant did not want to rape the victim at the motel so the defendant said that the group would leave the motel in his car. Fairweather testified that the defendant instructed Blanchard to sit in the front seat on the passenger's side next to the victim, who would be seated between him and the defendant. Defendant told Fairweather to sit in the back seat on the passenger's side. On the defendant's signal, Fairweather was to reach over the seat and stuff the sock into Launer's mouth. He and Blanchard would grab Launer, tie her hands with one necktie, and place the other tie over her mouth. According to Fairweather, the defendant said they would "take her clothes off, rape her, kill her and get rid of the body."

Fairweather continued, testifying that, as instructed by the defendant, he did start an argument with Soderberg which caused her to leave and not return. The group, now made up of the defendant, Blanchard, Fairweather, and Launer, then left the motel in the defendant's car positioned according to his instructions.

The defendant drove to an apartment complex in Rolling Meadows, parking in a grassy area behind some

tennis courts. Fairweather further testified that the defendant looked back at him and nodded. Fairweather responded by attempting to place the sock in Launer's mouth, but he was unsuccessful.

Fairweather did not see the victim being bound. However, he testified that he saw the defendant pull his knife from under the front driver's seat and begin cutting Launer's clothing. At this point, Fairweather stated that Blanchard left the vehicle. The defendant did not stop but proceeded to remove Launer's clothing.

The defendant laid Launer across the front seat. According to Fairweather, he saw the defendant position himself between her legs. He next heard a zipper being unzipped. He then heard a slap and heard the defendant say "open up, bitch." He also saw the defendant lower himself on top of the victim. A short while later, Fairweather heard a zip and snap and observed the defendant exit the car. At this point, Fairweather testified that he got into the front seat and was attempting to free Launer when the defendant returned and got into the back seat. Fairweather then "pretended" to have sexual intercourse with Launer. However, he denied having any sexual contact with her.

The defendant then got out of the car, opened the front door, and pulled the victim out of the car. Fairweather picked up her clothes, and the three walked toward the retention pond located close by.

Fairweather testified that the defendant forced Launer to the ground. She was lying on her back and Fairweather was holding her head. Fairweather testified that he saw the defendant pull out the knife, raise his hand, and strike Launer in the chest. He immediately let go of her head and started to walk away, at which point he "heard the knife go into the body again."

He and the defendant threw the body and the clothing into the pond. They returned to the car and, along with Blanchard, left the scene.

Fairweather further testified that the trio went to the home of the defendant's girlfriend, Mickey Jaksch. They woke her up and, according to Fairweather, the defendant told her that he had raped and killed a girl. Jaksch, who later testified as part of the State's case in chief, corroborated Fairweather's testimony as to this admission.

On cross-examination, Fairweather indicated that he too was charged with murder, rape, concealment of a homicidal death, unlawful restraint, and armed violence. He stated that he was charged as a juvenile and that, in return for his testimony, he would plead guilty to one charge, receiving a sentence of approximately four years, with the possibility of reduction for good time served.

Blanchard also testified for the State. Blanchard stated that he and Fairweather engaged in a conversation initiated by the defendant during which the defendant said that he wanted to have sex with Launer. According to Blanchard, the defendant talked about raping Launer and killing her if she resisted.

Blanchard stated that the defendant initiated another exchange with him and Fairweather. At this time, the defendant gave Fairweather a sock, telling him that he was to reach over the front seat and put the sock in Launer's mouth as a gag. According to Blanchard, the defendant gave him two or three ties which were to be used to bind the victim. Blanchard kept one and returned the others.

Blanchard testified that the group left the motel and drove to an apartment complex. The defendant was driving; he, Blanchard, was seated on the right passenger side; Launer was seated in the middle between the

defendant and Blanchard; Fairweather was seated in the back.

Blanchard stated that the defendant parked towards the back of the complex next to some tennis courts and a grassy field. After a short while, Blanchard observed the defendant look into the back seat and nod his head. He observed Fairweather reach over the front seat and attempt to place the sock in Launer's mouth. He was unsuccessful. Blanchard then observed a struggle between the defendant and Launer, but he did not see him either bind or gag her.

Blanchard testified that he then got out of the car and walked about 20 yards away. He further testified that he heard crying and moaning sounds coming from the defendant's car. A short while later, he observed the defendant pull Launer out of the car and watched as the defendant, Fairweather, and Launer walked into some trees and bushes, at which point he lost sight of them.

Blanchard testified that he heard moaning and sobbing, followed by a scream. A few minutes later, he heard a splash. The defendant and Fairweather then returned and the three left. While driving away, Blanchard stated that the defendant admitted stabbing Launer.

Blanchard continued, testifying that the three drove to the home of Jaksch, the defendant's girlfriend. There, Blanchard heard the defendant tell her that he just killed somebody: "her name was Liz."

On cross-examination, Blanchard stated that he was charged in a juvenile petition with concealment of a homicidal death. He acknowledged that, in return for his testimony, he expected the charge to be dropped.

The defendant was the sole witness in his defense. His testimony materially differed from that of Fairweather and Blanchard, particularly as to whose idea it was to rape and kill Launer and who actually killed her.

The defendant testified that it was Fairweather who wanted to have sex with Launer and, further, that it was Fairweather who said he would rape her if he had to and that "she would never go home again." According to the defendant, Fairweather supplied the sock and the ties, though he admitted that the tie used to bind Launer's hands belonged to his father.

The defendant further testified that he assisted Fairweather and Blanchard in tying up the victim. However, he denied raping her. He testified that he left the car and, when he returned, Fairweather's pants were down. Shortly thereafter, Fairweather got up, pulled up his pants, and the two of them pulled Launer from the car and walked towards the retention pond. There, the victim was told to lie down on the ground. When she did so, the defendant said that he knelt down and held her feet. The defendant testified that he saw Fairweather strike Launer in the chest with a knife which he admitted belonged to him. He and Fairweather then threw the body and the clothes into the pond and left. The defendant acknowledged going to Jaksch's house. However, according to the defendant, he said only that he was involved in the killing of a girl.

The jury found the defendant guilty on all counts. The matter then proceeded to a death penalty hearing. During the course of the hearing, the court granted a continuance of almost four weeks at the request of defense counsel.

The hearing resumed, and the court found that the defendant was born on February 2, 1957, and was 25 years old at the time of the offense. The court further found beyond a reasonable doubt the existence of one statutory aggravating factor: that the victim was killed in the course of a felony, rape, and that the defendant actually killed the victim. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6).

The court proceeded to take testimony in aggravation and mitigation. In aggravation, the State presented the testimony of Billy Johnson, who recounted an incident which occurred approximately two weeks before Launer was killed. Johnson testified that he and the defendant, at the defendant's suggestion, went to O'Hare International Airport to pick up a prostitute. Johnson testified that the defendant said they would have to "get rid" of her, meaning they would have to kill the prostitute after having sex. The State also presented the testimony of Leslie Blackstock, who testified that she was raped by Erickson in 1979.

The State also offered the testimony of Rolling Meadows' police detective Greenway, who recounted a conversation he recently had had with Joanne Combs, a former girlfriend of the defendant. Over defense objection, Greenway testified that Combs told him that the defendant slapped her around, made her pregnant, and threatened to kill her if she told anyone that he was the father. Greenway also testified that Combs said that the defendant had told her he once stabbed a black man to death.

Defendant offered two factors in mitigation: "no significant history of prior criminal activity" and the presence of an "extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(c)(1), (2).) In support of the second mitigating factor, defendant offered the testimony and report of Dr. John Weliczko, a psychotherapist. The court refused to qualify Dr. Weliczko as an expert. The court also denied the defendant's motion for a continuance to secure the testimony of an expert, ruling that such additional testimony would be cumulative to that of Dr. Weliczko, which the court would be considering.

The court found, after reviewing all of the evidence in aggravation and mitigation, that there were no miti-

gation factors sufficient to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(h).) In sentencing the defendant to death, the trial judge made reference to the defendant's parents, stating that, if he could consider their feelings, his judgment would be different.

Defendant raises 16 issues on appeal. Three concern the conduct of the trial, which defendant contends warrants reversal of this conviction and a new trial. Defendant raises nine issues concerning conduct of the death penalty hearing which he contends warrant remand for resentencing. He also raises four issues challenging the constitutionality of the death penalty statute. We first consider the issues relating to defendant's trial.

Defendant initially contends that he should be granted a new trial because the trial court erred in refusing to accept his pretrial waiver of the sentencing jury. The court further erred, according to the defendant, in permitting the State to question prospective jurors, who would be impaneled to consider the issue of his guilt or innocence, on their views regarding imposition of the death penalty pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.

Defendant relies upon the recent decision of this court in *Daley v. Hett* (1986), 113 Ill. 2d 75, which he characterizes as mandatory and retroactive. It is the defendant's position that *Hett* applies retroactively to his case and affords him the absolute right to waive the capital sentencing jury prior to the commencement of trial on the issue of guilt or innocence. He further contends that, if he exercises this right, *Hett* prohibits the State from questioning prospective jurors regarding the death penalty.

The State responds by arguing that *Hett* holds only that the trial court has the discretion to accept a pretrial

waiver. Alternatively, the State maintains that, even if *Hett* requires acceptance of a pretrial waiver, the court's refusal to accept defendant's waiver did not prejudice him because the resultant questioning of prospective jurors regarding the death penalty does not affect the jury's ability to return a fair verdict as to guilt or innocence. Finally, the State argues that *Hett* is not retroactive and, hence, does not govern this case.

We first consider whether or not the trial court is required to accept a defendant's pretrial waiver of the capital sentencing jury. We note, at the outset, that this was not the issue raised in *Hett*. The precise issue in *Hett* concerned the timing of a defendant's waiver of the capital sentencing jury under section 9—1(d)(3) of the Criminal Code of 1961, which provides that the sentencing proceeding in a capital case shall be conducted "before the court alone if the defendant waives a jury for the separate proceeding." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)(3).) In *Hett*, this court held that the statute permitted the tender of a waiver prior to the commencement of trial. We further held that the statute empowered the trial court to accept a capital defendant's pretrial waiver where the court found the waiver voluntary and knowing. The defendant in the instant case raises the next logical question but one not raised or addressed in *Hett*. That question is whether or not the trial court is required to accept a voluntary and knowing pretrial waiver.

It is the general rule that, if a defendant chooses to waive a right and the waiver is voluntary and knowing, the waiver must be accepted. This is the rule in Illinois with respect to the waiver of the constitutional right to a trial by jury. *People v. Steenbergen* (1964), 31 Ill. 2d 615, 617; *People v. Bradley* (1956), 7 Ill. 2d 619, 622-23, quoting *Patton v. United States* (1930), 281 U.S. 276, 74 L. Ed. 854, 50 S. Ct. 253.

We believe that the same principle governs the waiver of statutorily created rights such as the right here in issue. We therefore hold that, where a pretrial waiver of the sentencing jury is tendered and the court ascertains that it is voluntary and knowing, it must be accepted.

Defendant raises another issue also not decided in *Hett*. He contends that a pretrial waiver of the sentencing jury prohibits the State from posing questions to prospective jurors concerning their views about the death penalty.

This court observed in *Hett* that the State's right to pose death-penalty questions to prospective jurors "does not come into effect where *** the jur[y] that consider[s] the issue of guilt will not consider eligibility for the death penalty." (*Daley v. Hett* (1986), 113 Ill. 2d 75, 82.) Thus, the court let stand decisions which precluded the State from posing its death-penalty questions. We do not decide this issue left open in *Hett* because we believe that, even if *Hett* were read to prohibit death-penalty questioning of prospective jurors where the sentencing jury is waived prior to trial, it would not apply retroactively to defendant's case.

Judicial opinions announcing new constitutional rules applicable to criminal cases are retroactive to all cases pending on direct review at the time the new constitutional rule is declared. (*Griffith v. Kentucky* (1987), 479 U.S. 314, ___, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716.) In *Griffith*, the Supreme Court ruled that its decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, "applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Batson* held that a criminal defendant could attack a prosecutor's racially motivated use of peremptory challenges in his own trial without establishing a case-by-case history of racially motivated peremptory challenges.

Our reading of *Griffith* leads us to conclude that retroactivity is triggered when two factors are present: (1) the case to which the new rule is to be applied was not final or was pending on direct review when the rule was declared and (2) the rule to be applied retroactively is of constitutional dimension. As defendant's case was pending on direct review when *Hett* was decided, the retroactive impact of *Hett* depends only upon the applicability of the second factor to his case.

The right to a sentencing jury in a capital case is a statutory, not a constitutional, right. This general rule was reaffirmed recently by the Supreme Court in *Spaziano v. Florida* (1984), 468 U.S. 447, 464, 82 L. Ed. 2d 340, 355, 104 S. Ct. 3154, 3165, where the court held "that the Sixth Amendment does not require jury sentencing." Also in *Spaziano*, the court reiterated its position that it was "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." (468 U.S. 447, 464, 82 L. Ed. 2d 340, 355, 104 S. Ct. 3154, 3165.) On the authority of *Spaziano*, it is apparent that the *Hett* decision concerned a statutory right and that the rule announced therein is of statutory, not constitutional, dimension. Because *Griffith* addresses a rule which pertains to a constitutional right and the defendant herein seeks retroactive application of a rule which pertains to a statutory right, we do not deem *Griffith* controlling.

We also do not believe that *Griffith* controls the retroactive application of a newly announced rule of criminal procedure which in no way implicates the fundamental fairness or the truth-seeking effectiveness of a defendant's trial on the issue of guilt or innocence. In cases such as *Hett* where the announced rule is statutory in origin and purely procedural in effect, we believe that the proper test of retroactivity is the three-pronged test set forth in *Stovall v. Denno* (1967), 388 U.S. 293, 297,

18 L. Ed. 2d 1199, 1203, 87 S. Ct. 1967, 1970, and reaffirmed in Solem v. Stumes (1984), 465 U.S. 638, 642-50, 79 L. Ed. 2d 579, 586-91, 104 S. Ct. 1338, 1341-45. It is to be noted that the three-pronged Stovall analysis was adopted and applied by this court in People v. Laws (1981), 84 Ill. 2d 493, 498-501. We are persuaded of the continued validity of the Stovall analysis of retroactivity in cases involving a statutory rule of criminal procedure, such as the statutory right to waive the sentencing jury here in issue, which is unrelated to fundamental fairness and the truth-seeking function of a trial.

The Stumes-Denno analysis considers the following three factors in determining whether or not a decision announcing a new rule of law will be applied retroactively: (1) the purpose of the new rule, particularly whether or not it enhances the truth-seeking process; (2) the extent to which law-enforcement officials relied upon a prior rule of law supplanted by the new rule; and (3) the effect on the administration of justice of the retroactive application of the newly announced rule. Applying the first factor, the defendant has made no showing that the jury's truth-seeking function in his case would be aided in any way by holding Hett retroactive insofar as it could be read to prohibit death-penalty questioning of jurors after a pretrial waiver of the sentencing jury has been accepted. Unless it can be shown that a prohibition against such questioning bears directly on the jury's truth-seeking role, retroactivity is not favored. Indeed, since Hett addressed only the timing of a waiver of the sentencing jury, it is unrelated to the truth-seeking role of the jury impaneled to decide a defendant's guilt or innocence.

The second element of the Stumes-Denno test concerns the reliance of law-enforcement officials on an old rule of law replaced by a new rule of law. This element

is inapplicable where, as here, the rule of law is new and does not replace a prior rule.

The final element of the *Stumes-Denno* test requires that we consider the impact of *Hett* on the administration of justice if it were applied retroactively. Any evaluation of the impact on the administration of justice would be dependent, in part, upon whether or not death penalty questioning, in alleged violation of *Hett*, warrants retrial. Obviously, defendant, in seeking a new trial, espouses this construction of *Hett*. If defendant is correct, the retroactive application of *Hett* might well place a severe strain on the administration of justice because of the cost in judicial resources required to retry all cases in which a pretrial waiver of the sentencing jury was rejected and prospective jurors questioned concerning imposition of the death penalty.

Defendant has made no showing that the impact on the judicial system occasioned by retrials resulting from the retroactive application of *Hett* would be manageable. In the absence of such a showing, we will not assume either a minimal or a manageable impact only to discover, perhaps too late, a judicial system straining to accommodate a large number of retrials while attempting, at the same time, to perform its usual tasks effectively and efficiently.

We believe, therefore, that the retroactive application of *Hett*, insofar as it can be read to prohibit death-penalty questioning subsequent to acceptance of a pretrial waiver of the sentencing jury, would place an unacceptable burden upon the administration of justice without achieving a corresponding increase in the jury's ability to fairly and effectively arrive at the truth. For these reasons, we hold that *Hett* is not retroactive. Defendant is not entitled to a new trial either because he was unable to waive the sentencing jury prior to trial or because the

State was allowed to query prospective jurors concerning imposition of the death penalty.

It is clear as well that, unless the defendant can demonstrate that the death questioning of prospective jurors produced an unfair jury, he would fare no better if we were to hold *Hett* retroactive. It is well established that a jury questioned regarding imposition of the death penalty is presumed to be a fair jury on the issue of guilt or innocence. (*Buchanan v. Kentucky* (1987), 483 U.S. ___, ___, 97 L. Ed. 2d 336, 350, 107 S. Ct. 2906, 2913; *Lockhart v. McCree* (1986), 476 U.S. 162, 184, 90 L. Ed. 2d 137, 154-55, 106 S. Ct. 1758, 1770; *Wainwright v. Witt* (1985), 469 U.S. 412, 419-22, 83 L. Ed. 2d 841, 849-53, 105 S. Ct. 844, 850-53.) Our cases are in accord. *People v. Free* (1983), 94 Ill. 2d 378, 401; *People v. Tiller* (1982), 94 Ill. 2d 303, 321-22; *People v. Lewis* (1981), 88 Ill. 2d 129, 147.

Defendant has made no showing which would overcome this presumption. Therefore, the questioning of defendant's jury did not violate his right to trial by a fair and impartial jury. Defendant is not entitled to a new trial even if *Hett* were applied retroactively.

Defendant also seeks a new trial because the trial court failed to dismiss or admonish three jurors who heard allegedly prejudicial remarks given during the *voir dire* of a prospective juror who subsequently was excused for cause. Defendant complains of the following comments.

> "Just some of the people I come into contact [with] were former State's Attorneys or former Assistant Attorney Generals and things like that, and they have made comments about cases that are serious cases such as this one that are brought before the court.
>
>              \* \* \*
>
> \*\*\* I guess what I am getting at is that they made the comments that until they thought they had some

cases that they would plea bargain, or their knowledge is *** that they wouldn't try a case until they had a 'locked solid case.' "

The State contends that this issue was waived because it was not raised as error in defendant's motion for a new trial. On the merits, the State maintains that the remarks complained of were not prejudicial.

The State is correct that the defendant did not raise this issue in his motion for a new trial. However, the record reveals that this issue was contested vigorously by defense counsel during *voir dire* and, if the remarks were prejudicial, the seating of the jurors who heard them might well undermine the jury's ability to reach a verdict solely on the evidence presented. We therefore consider the merits.

We believe that *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 428-29, *cert. denied* (1985), 474 U.S. 883, 88 L. Ed. 2d 173, 106 S. Ct. 204, is dispositive. In *Del Vecchio*, a prospective juror during *voir dire,* in response to a question as to whether or not she had an opinion about the defendant's guilt, answered, "I think the guy shouldn't be out walking the streets." This juror was excused, but the remaining veniremen who had heard the remark were neither interrogated nor admonished about it. The court in *Del Vecchio* refused to conclude that the mere hearing of this comment precluded the jury from reaching a verdict based solely on the evidence placed before it.

We believe that the comment in *Del Vecchio* would more likely affect a jury's impartiality than the comment here in issue. Yet, the *Del Vecchio* court did not find the comment prejudicial. In the instant case and with respect to a less disturbing remark, we also conclude that the remark in question was not prejudicial. The trial court did not err in seating the three jurors without admonishment.

Defendant next contends that he was denied a trial by a jury representing a fair cross-section of the community because prospective jurors were queried about their views on imposition of the death penalty. Defendant asserts that a jury so questioned is biased towards conviction. Apparently, it is defendant's position that the resulting jury is conviction prone and does not represent the full range of beliefs in the community regarding the death penalty. Because all views are not represented, he contends, the fair–cross-section requirement of the sixth amendment is violated. He concludes that he should be granted a new trial.

The recent cases of *Buchanan v. Kentucky* (1987), 483 U.S. ___, 97 L. Ed. 2d 137, 107 S. Ct. 2906, and *Lockhart v. McCree* (1986), 476 U.S. 162, 184, 90 L. Ed. 2d 137, 154-55, 106 S. Ct. 1758, 1770, resolve this issue against the defendant. In both *Buchanan* and *McCree*, the Supreme Court held that the composition of a jury impaneled after being questioned about imposition of the death penalty does not violate the fair–cross-section requirement of the sixth amendment even if the jury were conviction prone.

Our cases are in accord with *Buchanan* and *McCree*. (*People v. Neal* (1985), 111 Ill. 2d 180, 197, *cert. denied* (1986), 476 U.S. 1165, 90 L. Ed. 2d 733, 106 S. Ct. 2292; *People v. Caballero* (1984), 102 Ill. 2d 23, 45, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.) It is clear that death penalty questioning of prospective jurors does not implicate the fair–cross-section requirement of the sixth amendment. The trial court did not err in permitting such questioning.

We find no error in the conduct of defendant's trial and, therefore, affirm his convictions. We turn now to a consideration of the issues related to defendant's sentencing hearing.

Defendant claims error in the admonishment given him by the court prior to accepting his waiver of the capital sentencing jury. In explaining the role of the sentencing jury, the court stated:

> "Do you understand that the verdicts of the jury in the case of determining whether or not the death penalty would be imposed must be a unanimous verdict just as their verdict as to your guilt or innocence had to be unanimous?
>
> That means all twelve jurors must conclude that the punishment should be death before the death penalty could be imposed in this case."

The defendant maintains that the error in the foregoing admonishment was the court's failure to indicate that the death penalty could not be imposed if only a single juror believed that there were sufficient mitigating factors to preclude imposition of the death penalty.

The State again argues that this issue was waived because it was not included in defendant's motion for a new trial. Alternatively, the State argues that the foregoing admonishment was correct as a matter of law and, therefore, defendant's waiver of the sentencing jury was valid. We agree.

This court has expressed a preference for just such an admonishment as was given to the defendant. (*People v. Albanese* (1984), 104 Ill. 2d 504, 536, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Further, this court has approved admonishments substantially similar to the one given in this case. *People v. Morgan* (1986), 112 Ill. 2d 111, 140-41; *People v. Brownell* (1980), 79 Ill. 2d 508, 536-37, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.

We have never imposed a requirement that a valid admonition must include an explanation that a single juror's belief is sufficient to preclude imposition of the death penalty. We decline defendant's invitation to estab-

lish such a requirement. In our view, the admonition given to the defendant was painstaking, extensive, accurate, and without error.

Defendant next argues that he should receive a new sentencing hearing because the court refused to allow him to call two jurors who would testify that the jury convicted the defendant as an accomplice, not as a principal. He contends that this testimony would establish that he is ineligible for the death penalty.

The State responds that this issue was waived for failure to raise it as error in defendant's motion for a new trial. Alternatively, the State contends that where, as here, the sentencer finds that the defendant actually and intentionally killed the victim, it is of no legal significance that the jury considering the issue of guilt or innocence might have convicted the defendant as an accomplice. In support of its position, the State cites the recent Supreme Court decision of *Cabana v. Bullock* (1986), 474 U.S. 376, 88 L. Ed. 2d 704, 106 S. Ct. 689.

We have reviewed *Bullock* and agree that it is dispositive of this issue. In *Bullock*, the defendant was convicted of murder as an accomplice under a State statute which permitted a finding of guilt in the absence of any conduct by the defendant contributing to the victim's death. Under the statute, the conviction of an accomplice for murder could be based solely upon a finding beyond a reasonable doubt that he or she participated in the underlying felony. Bullock was found guilty of robbery, the predicate felony, as an accomplice. His complicity in the underlying felony provided the basis for his conviction for murder. Subsequently, Bullock was sentenced to death.

The Supreme Court vacated Bullock's death sentence, reaffirming prior holdings that the death penalty could not be imposed upon an accomplice unless he or she "actually killed, attempted to kill, or intended that lethal

force be used." (*Cabana v. Bullock* (1986), 474 U.S. 376, 390, 88 L. Ed. 2d 704, 719, 106 S. Ct. 689, 699.) However, the Supreme Court refused to hold that this finding must be made by the jury which considers the issue of guilt or innocence. The court concluded only that "at some point in the [State-court] process, the requisite factual finding as to the defendant's culpability [must be] made." 474 U.S. 376, 387, 88 L. Ed. 2d 704, 717, 106 S. Ct. 689, 697.

We have examined the record of the death penalty proceeding in this case in light of *Bullock* and conclude that the "requisite factual finding as to the defendant's culpability" was made by the court sitting as the sentencer. Thus, the court stated, "the victim here \*\*\* was actually killed by the [d]efendant, \*\*\* not by any other party. He killed her intentionally." Here, the sentencer made the requisite finding of culpability. Therefore, it is unnecessary to inquire on what basis the jury convicted the defendant. Furthermore, defendant's attempt to call jurors at his sentencing hearing amounts to an attempt to impeach the verdict of guilt. However, the general rule, long recognized in Illinois, is that statements by members of a jury cannot be utilized to explain or alter the meaning or effect of its verdict. (*Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532, 539-40.) Clearly, the defendant is impermissibly trying to explain or alter the meaning of the verdict of guilt entered against him contrary to the rule of *Chalmers*. We therefore conclude that the court did not err in refusing to allow the defendant to call jurors to testify at his death penalty hearing.

Defendant next challenges the admission of the testimony of three witnesses presented by the State during the aggravation and mitigation phase of the death penalty proceeding. Defendant first challenges the admission of Johnson's testimony regarding the incident at O'Hare

Airport and defendant's comment that, after having sexual relations with a prostitute, she would have to be "gotten rid of."

Defendant argues that this testimony is not a reliable indicator of his intent to use force against another person. He also argues that this testimony cannot be deemed reliable because Johnson testified that he did not believe the defendant's comments about "getting rid of" a prostitute.

The State again urges that this issue was waived because not preserved for review. As to the merits, the State maintains that Johnson's testimony was reliable. According to the State, the defendant and Johnson actually went to O'Hare. In addition, it is undisputed that the defendant made the statements attributed to him by Johnson about picking up a prostitute, having sex, and, then, killing her. Finally, the State points out that Johnson gave unimpeached testimony that the defendant displayed a knife in conjunction with making the statements about killing a prostitute. The State also notes that the reliability of Johnson's testimony is not affected by whether or not he personally believed the defendant.

It is well settled that the standard for admissibility of evidence proffered during the aggravation and mitigation phase of a death penalty hearing is relevance and reliability. (*People v. Perez* (1985), 108 Ill. 2d 70, 88, *cert. denied* (1986), 474 U.S. 1110, 88 L. Ed. 2d 931, 106 S. Ct. 898; *People v. Brisbon* (1985), 106 Ill. 2d 342, 364, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276.) Applying this standard, we conclude that Johnson's testimony was relevant and reliable.

The record indicates that the incident recounted by Johnson not only occurred but transpired only a few weeks prior to the events which culminated in Launer's rape and stabbing death. Further, the statements which Johnson attributed to the defendant parallel testimony

given during the State's case in chief regarding statements the defendant made about raping and killing Launer. It is clear that Johnson's testimony was relevant.

We also believe that this testimony was reliable. Johnson was cross-examined, yet he remained unimpeached. The fact that Johnson did not believe the defendant is irrelevant to whether or not defendant made the statements, particularly where the comments were made in conjunction with conduct consistent with the plan articulated thereby. On this record, we find no error in the admission of Johnson's testimony.

Defendant also contests the admission of the testimony of Blackstock, who testified that the defendant raped her in 1979. Defendant argues that the court erred in admitting this testimony as evidence of criminal activity since the court acknowledged that it might not have been sufficient to prove him guilty beyond a reasonable doubt had he been tried for rape.

The State contends that defendant has waived this issue. On the merits, the State argues that Blackstock's testimony was relevant and reliable and, hence, admissible. We agree.

Rape was one of the offenses with which the defendant was charged and convicted. Blackstock testified that he raped her. Manifestly, her testimony in this regard is relevant in aggravation. As to its reliability, Blackstock was cross-examined and her testimony remained unchanged. Therefore, the court was warranted in considering her testimony reliable. We conclude the court did not abuse its discretion in admitting Blackstock's testimony.

Defendant next challenges the admission of Detective Greenway's double hearsay testimony in aggravation. Greenway testified that one of defendant's former girlfriend's told him that the defendant had threatened to

kill her and also told her that he once had stabbed a black man to death. Defendant argues that this double hearsay is unreliable and that the court abused its discretion in admitting it.

The State responds that reliance and relevance are the sole factors governing admissibility of evidence in the aggravation and mitigation phase of the death penalty proceeding. The State concludes, therefore, that the double hearsay characterization of Greenway's testimony is of no legal consequence. Apparently conceding the possibility that Greenway's testimony was unreliable, the State contends that where, as here, the court alone determines the sentence, the court "is presumed to have considered only properly admitted evidence." *People v. Eddmonds* (1984), 101 Ill. 2d 44, 66, *cert. denied* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271.

This court has admitted hearsay testimony in aggravation, concluding that the hearsay nature of the testimony goes to the weight, rather than the admissibility, of the testimony. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 533.) We note, however, that where this court has sanctioned the admission of double hearsay at least some parts of the double hearsay have been corroborated by other evidence. *People v. Perez* (1985), 108 Ill. 2d 70, 86-87.

The record of the death penalty proceeding in this case does not reveal corroboration of any portion of Greenway's testimony, therefore raising at least a question as to its reliability. However, we observe that the court did not cite Greenway's testimony in announcing the factors it considered in aggravation. Absent a contrary showing, we believe that the court "considered only properly admitted evidence" in pronouncing sentence. *People v. Eddmonds* (1984), 101 Ill. 2d 44, 65-66. See also *People v. Miller* (1964), 30 Ill. 2d 110, 115.

Defendant next claims that the court abused its discretion when it refused to grant him a continuance in order to secure expert testimony as to the presence of mitigating factors. During the aggravation and mitigation stage of the proceedings, defendant attempted to qualify Dr. John Weliczko as an expert and to introduce his testimony and report regarding the statutory aggravating factor that he "was under the influence of extreme mental or emotional disturbance" at the time of the murder. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(c)(2).) On motion of the State, the court refused to qualify Dr. Weliczko as an expert, ruling that he did not qualify for such treatment under section 102—21 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 102—21). However, the court indicated that it would allow Dr. Weliczko to testify as to his "opinion relative to any mental illness or emotional disturbance that he believes the defendant to possess or has possessed." Further, the court accepted into evidence Dr. Weliczko's written evaluation of the defendant. The trial judge also stated that he would "receive and would weigh [Dr. Weliczko's] testimony along with all the other factors that [he was] required to weigh under the law." In denying defendant's motion for a continuance, the court observed that the defendant already had received a continuance of approximately four weeks. Finally, the court indicated that additional testimony would be cumulative to that of Dr. Weliczko.

It is defendant's position that the testimony of Dr. Weliczko, considered by the court as lay testimony rather than as expert testimony, was not treated with the same deference as the testimony given by the State's expert witness. Hence, he argues that he was not afforded an adequate opportunity to present evidence in mitigation. Therefore, he concludes that he was denied a fair sentencing hearing.

We believe that defendant's position is without merit. First, defendant had the advantage of a four-week continuance, granted at his request, during which to prepare his case in mitigation. He clearly had ample time to seek out additional experts to testify when the sentencing hearing reconvened. He did not avail himself of this opportunity. Thus, any surprise occasioned by the court's refusal to qualify Dr. Weliczko as an expert is diminished by defendant's failure to use the four-week continuance to bolster his case in mitigation. Moreover, the court expressly indicated that it accepted and would weigh both Dr. Weliczko's testimony and report. On this record, we conclude that the court did not abuse its discretion in refusing to grant a continuance.

Defendant claims that the court, in sentencing him to death, erred in considering his lack of remorse as an aggravating factor. The State contends that defendant's lack of remorse is a proper factor to consider.

This court has held that a "defendant's [lack of] remorse is a proper subject for consideration at sentencing." (*People v. Neal* (1985), 111 Ill. 2d 180, 196. See also *People v. Ward* (1986), 113 Ill. 2d 516, 527-33; *People v. Morgan* (1974), 59 Ill. 2d 276, 282.) Consequently, the court did not err in taking into account defendant's lack of remorse.

Defendant also challenges his sentence as inappropriate and excessive in light of the four-year term apparently facing Fairweather, the juvenile accomplice in this case. Defendant relies on *People v. Gleckler* (1980), 82 Ill. 2d 145, in which this court vacated a death sentence as disproportionate to the lengthy term of imprisonment given to another participant in the crime.

The State maintains that *Gleckler* is inapposite because, unlike the defendant in the instant case, Gleckler had "the personality of a door mat, and a problem with alcohol, [and] was not the ringleader in this sordid af-

fair." (82 Ill. 2d 145, 171.) We are persuaded by the State's position.

We believe that *Gleckler* is distinguishable from defendant's case. Unlike *Gleckler*, there is ample evidence establishing that defendant conceived the plan resulting in the rape and killing of Launer; actively sought out and involved the juvenile accomplice in his plan; furnished the murder weapon; and orchestrated the efforts to conceal the body and dispose of the evidence. Given the role of the defendant, which was fully supported by the evidence adduced at trial, defendant's sentence reflected the extent of his participation.

Defendant also contends that his sentence constitutes cruel and unusual punishment because the court refused to consider sympathy for defendant's parents as a mitigating factor. At the conclusion of the sentencing hearing, the court said "[m]y heart goes out to the Erickson seniors and if my judgment in any way in this case could take into consideration *their feelings*, the judgment no doubt would be different. But, I cannot, no more than I could take into consideration perhaps the feelings of the victim's family, the Launers, as they sit here today because that would not be justice either." (Emphasis added.)

We believe that this comment reflects the court's concern that "mere sympathy" unrelated to the circumstances of the crime or to the history and character of the defendant is not a constitutionally relevant factor in determining the appropriate sentence in a capital case. The court's view is correct in light of two recent Supreme Court capital-sentencing decisions which considered the role of sympathy both as an aggravating and a mitigating factor. In *Booth v. Maryland* (1987), 482 U.S. ___, ___, 96 L. Ed. 2d 440, 452, 107 S. Ct. 2529, 2536, the court held unconstitutional the use of victim impact evidence in the aggravation phase of a capital-sentencing

proceeding. The court indicated that such evidence is often emotionally charged and concluded that its use was "inconsistent with the reasoned decisionmaking *** require[d] in capital cases." Also, in *California v. Brown* (1987), 479 U.S. 538, ___, 93 L. Ed. 2d 934, 938, 107 S. Ct. 837, 838, the court upheld an instruction which cautioned the sentencing jurors that they " 'must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' ***." The court concluded that this instruction was useful in insuring that the death penalty, if imposed, is based on the facts of the crime and the character of the defendant rather than on "extraneous emotional factors." (479 U.S. 538, ___, 93 L. Ed. 2d 934, 939, 941, 107 S. Ct. 837, 840.) We therefore hold that the trial court did not err in declining to consider sympathy for the defendant's parents in imposing the death penalty upon the defendant.

We have reviewed all of the issues defendant raises regarding his sentencing hearing and find no error. We turn now to defendant's four challenges to the constitutionality of Illinois' death penalty statute.

Defendant first argues that the death penalty statute is unconstitutional because it vests arbitrary discretion in the State's Attorney to seek the death penalty. This issue has been resolved against the defendant by prior cases of this court. (*People v. Madej* (1985), 106 Ill. 2d 201, 211, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 268; *People v. Stewart* (1984), 104 Ill. 2d 463, 498-99, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368.) We continue to adhere to these decisions.

Defendant also maintains that the death penalty statute is unconstitutional because it does not require that the prosecution prove beyond a reasonable doubt the absence of mitigating factors sufficient to preclude imposi-

tion of the death penalty. Again we observe that this precise issue has been raised repeatedly and resolved against the defendant. (*People v. Perez* (1985), 108 Ill. 2d 70, 96; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 444; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Kubat* (1983), 94 Ill. 2d 437, 504, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) Defendant offers no new argument on this point, instead asking that we reconsider our prior holdings. We decline this invitation and reaffirm these holdings.

Defendant further challenges the constitutionality of the death penalty because it does not require the sentencer to determine that death is the appropriate punishment. We have considered this position on other occasions and rejected it. (*People v. Walker* (1985), 109 Ill. 2d 484, 508-09; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 444.) Since the defendant presents no new argument, we reaffirm this court's prior holdings on this issue.

Defendant's final contention is that the death penalty statute is unconstitutional because it does not provide a procedure whereby a sentence of death is reviewed to ascertain whether or not it is proportional to the penalty given in similar cases. This argument has been reviewed thoroughly by this court and rejected. (*People v. Walker* (1985), 109 Ill. 2d 484, 508; *People v. Silagy* (1984), 101 Ill. 2d 147, 161, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227.) Moreover, this argument has been considered and rejected by the Supreme Court as well. (*Pulley v. Harris* (1984), 465 U.S. 37, 44-51, 79 L. Ed. 2d 29, 36-41, 104 S. Ct. 871, 876-80.) Therefore, we adhere to our prior holdings on this issue.

For the reasons stated herein, we affirm the judgment of the circuit court of Cook County. The clerk of this court is directed to enter an order setting Tuesday, September 15, 1987, as the date on which the sentence of death entered in the circuit court is to be imple-

mented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.

JUSTICE SIMON, dissenting:

The defendant in this case attempted to waive a jury for the penalty phase prior to his trial in order to avoid having prospective jurors death-qualified or "Witherspooned." The waiver was refused, and the jury was Witherspooned. The defendant tendered another waiver after the guilt phase, which was accepted, and the judge alone sat at the sentencing hearing. The question which the majority opinion does not and, I think, cannot answer is what legitimate purpose there could be for death-qualifying a jury which will have nothing to do with sentencing. We recognized the impropriety of such a practice and resolved this problem on June 20, 1986, in *Daley v. Hett* (1986), 113 Ill. 2d 75, yet in this case the court eviscerates *Hett*, leaving it without meaning. After this decision all we know is that the defendant has the right to waive his sentencing jury before trial, but we are left wondering why he would ever want to do so if such a waiver does not preclude *voir dire* questioning designed to put the death penalty question at the forefront of the jurors' minds.

The majority opinion offers up a veritable shopping list of alternative reasons why the defendant is not enti-

tled to a new trial under *Hett*. It first suggests, for example, that *Hett* did not decide that a trial judge must accept a knowing and intelligent pretrial waiver of the jury for sentencing. Instead, says the majority, the court only held that a trial judge has discretion to accept a pretrial waiver.

This conclusion misreads *Hett*. The waiver question there was phrased in terms of the trial court's ability to accept a pretrial waiver only because of the procedural posture in which the case arose—attempts by the State to compel two judges to refuse pretrial sentencing jury waivers. But the holding and the rationale of *Hett* made clear that the defendant is "accorded the right" (*Daley v. Hett* (1986), 113 Ill. 2d 75, 82) to waive a sentencing jury at any time under the "clear and unambiguous" (113 Ill. 2d 75, 81) language of the Criminal Code of 1961. Nothing in our opinion suggested that the decision to accept a knowing and intelligent waiver was discretionary; indeed, it is obvious that there could be no basis for the exercise of such discretion. On what ground other than judicial caprice could a judge refuse a knowing and intelligent waiver? This court's decision in *People v. Shum* (1987), 117 Ill. 2d 317, correctly explains *Hett* as holding that the "defendant had a right to execute a jury waiver for the penalty phase of the trial prior to the commencement of the guilt phase" (117 Ill. 2d 317, 338). After *Hett*, the majority's conclusion in this case that the judge must accept a voluntary pretrial waiver of a sentencing jury, as he must accept voluntary waivers of other rights, is merely redundant.

Consistent with its stinted reading of *Hett* on the waiver issue, the majority asserts that the propriety of death-qualifying a jury which has been waived for sentencing was "also not decided in *Hett*" (117 Ill. 2d at 288). This is difficult to square with the court's holding in *Hett* that the State's "right under *Witherspoon* does

not come into effect where, as here, the juries that consider the issue of guilt will not consider eligibility for the death penalty." (*Daley v. Hett* (1986), 113 Ill. 2d 75, 82.) How this language suggests that the Witherspooning issue has been "left open" (117 Ill. 2d at 288), I cannot understand. As I read *Hett*, we specifically held that the State had no legitimate reason for Witherspooning a jury which had been waived for sentencing.

Whether or not the court admits that the question has already been decided, the answer seems beyond dispute: no justification can be advanced to permit death-qualifying a jury which will not sit at the penalty phase. If such *voir dire* were permitted in capital cases in which the jury does not pass sentence, why not also in noncapital cases? In both situations, the jurors' attitudes on the death penalty are immaterial to the only issue they will consider—guilt or innocence—and yet any attempt to Witherspoon a jury in, for example, a simple burglary case (for which the death penalty is not available) would certainly be denounced as improper.

Rather than meet the question supposedly left open, the court retreats to the refuge of nonretroactivity, holding that even if *Hett* means what it clearly says, the rule would not apply to the defendant's case in which *voir dire* predated our decision in *Hett*. This bit of maneuvering unfortunately leaves the issue in a state of limbo so that even in the future trial courts will have no clear guidance as to whether we are for or against Witherspooning in this situation. The court's vacillation here, taken together with the decision in *Hett*, implies that a judge may exercise discretion as to whether or not to permit Witherspooning of a jury voluntarily waived for sentencing prior to trial. There are no standards, though, guiding this determination, and thus "discretion" here is reduced to no more than the whim of the trial judge. Without a uniform, even-handed procedure

we can certainly expect additional petitions for *mandamus* in future capital cases until this matter is finally resolved. For this reason alone I would not avoid the question here.

More importantly, no question of retroactivity is even involved here. The majority does not appear to dispute the general rule that judicial decisions apply retroactively (*Solem v. Stumes* (1984), 465 U.S. 638, 642, 79 L. Ed. 2d 579, 586, 104 S. Ct. 1338, 1341), yet the court fails to advance any reason why this case should fall outside that rule. The question of retroactivity only arises when there has been a change in the law. *Swisher v. Duffy* (1987), 117 Ill. 2d 376, 380; *People v. Britz* (1986), 112 Ill. 2d 314, 318-19.

There has been no change in the law here. In *Hett*, we described the statutory provision under which a defendant is permitted to waive a sentencing jury at any time as "clear and unambiguous" (*Daley v. Hett* (1986), 113 Ill. 2d 75, 81). Since, as *Hett* also recognized, it makes no sense to death-qualify a jury which will have nothing to say about the death penalty, it should have been equally plain that Witherspooning was impermissible. Prior to our *Hett* decision several of our able circuit judges recognized this and refused to Witherspoon such juries. (See, *e.g., Daley v. Hett* (1986), 113 Ill. 2d 75 (Judges Hett and Carey); *People v. King* (1986), 109 Ill. 2d 514, 543-45 (Judge Miller); People ex rel. Daley v. Strayhorn (June 20, 1986), No. 63498 (Judge Strayhorn); People ex rel. Daley v. Stein (June 5, 1985), No. 61980 (Judge Stein).) The fact that this court had never specifically ordered trial judges to comply with what was obviously the law does not mean that when we finally spoke on the issue the law was changed. There is no reason to rule upon a retroactivity issue where none exists.

Even assuming that we should consider whether the *Hett* rule is to be applied retroactively, there is no justifi-

cation for belatedly dredging up the discredited analysis of *People v. Laws* (1981), 84 Ill. 2d 493, which was torpedoed by this court in *People v. Martine* (1985), 106 Ill. 2d 429. *Laws* adopted the three-part test articulated in *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967, to find that a new rule of fourth amendment law could not be applied retroactively even on direct review. Subsequent to our decision in *Laws*, the United States Supreme Court considered the retroactivity of another new fourth amendment rule in *United States v. Johnson* (1982), 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579. In *Johnson*, the court rejected the three-part test with respect to cases on direct review and determined that, as to such cases, new principles of fourth amendment law not marking a clear break with the past had to be applied retroactively. Thereafter, in *Martine*, this court was again faced with the retroactivity of the same fourth amendment rule as in *Laws*, and held that "*Laws* can no longer be followed." *People v. Martine* (1985), 106 Ill. 2d 429, 433.

It is difficult to understand how the majority could be "persuaded of the continued validity" (117 Ill. 2d at 290) of *Laws* notwithstanding this history, and despite the fact that the United States Supreme Court has now completely renounced the *Stovall* analysis insofar as it purports to measure the retroactivity of new principles to cases still pending on direct review. (*Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) In *Griffith*, the court abandoned the three-part test and held that new principles of constitutional law must be applied retroactively to all cases still pending on direct review, even if the new rule is a "clear break with the past." The majority's effort to salvage the wreck of the three-part *Laws* analysis in the context of cases on direct review is inconsistent with *Griffith*. Nevertheless, the majority disregards the true sweep of the *Griffith*

opinion. Without explanation, the court distinguishes this case on the ground that the *Griffith* rule of automatic retroactivity only applies to cases in which the new principle is one of *constitutional* law.

*Griffith* did involve the retroactivity of a new constitutional principle. And I agree that this case does not clearly implicate the retroactivity of a new principle of Federal constitutional law. Neither of these facts, however, justifies the court's summary rejection of *Griffith*. The majority opinion, by ignoring the reasoning of *Griffith*, conveys the impression that *Griffith* was an arbitrary decision and that one rule of retroactivity is as good as another. In my view, the Supreme Court's reasoning in that case was not only compelling, but as applicable in nonconstitutional cases as in constitutional ones.

*Griffith* was based largely on the Supreme Court's recognition that "the integrity of judicial review requires that we apply [a new] rule to all similar cases pending on direct review." (*Griffith v. Kentucky* (1987), 479 U.S. 314, ___, 93 L. Ed. 2d 649, 658, 107 S. Ct. 708, 713.) The court relied on the view earlier advanced by Justice Harlan:

> " 'If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all. . . . In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation.' " (479 U.S. 314, ___, 93 L. Ed. 2d 649, 658, 107 S. Ct. 708, 713, quoting *Mackey v. United States* (1971), 401 U.S. 667, 679, 28 L. Ed. 2d 404, 413, 91 S. Ct. 1160, 1173 (Harlan, J., concurring).)

Denying retroactivity to new nonconstitutional principles, the result sanctioned by the majority in this case, undermines the integrity of the judicial process in pre-

cisely the same way: it permits us to adopt a new rule but then to decline to apply the law in a later case. I can see no meaningful difference here which would justify limiting the rule of automatic retroactivity to constitutional cases. Although relying on a purported distinction between new constitutional principles and other new principles of law, the majority fails to defend the distinction or to explain what significance it has.

The absence of any attempt by the majority to defend this distinction is hardly unexpected since the *Stovall-Laws* test which the majority insists on adhering to suffers exactly the same supposed disability as the *Griffith* rule the court rejects: it, too, is a rule of retroactivity for constitutional principles. The majority does not come to terms with the fact that *Stovall v. Denno* also involved the retroactivity of a new principle of constitutional law, the sixth amendment right to have counsel present at certain out-of-court identifications. Similarly, *Solem v. Stumes* (1984), 465 U.S. 638, 79 L. Ed. 2d 579, 104 S. Ct. 1338, also relied upon by the majority, concerned the retroactivity of a new fifth amendment rule, and *Laws* a new decision under the fourth amendment. If the *Stovall-Laws* test, conceived for and applied to constitutional cases, is not, by reason of its origin and application, inapplicable to nonconstitutional cases, it is logically incoherent for *Griffith* to be rejected because of its creation in a constitutional context.

The majority also suggests that *Griffith* should not apply because the *Hett* rule (if it exists) is "purely procedural" and "is unrelated to fundamental fairness and the truth-seeking function of a trial." (117 Ill. 2d at 290.) There are three crucial flaws in this argument. First, the very point of the *Griffith* decision is that retroactivity with respect to cases still on direct review should not depend "upon the particular characteristics of the new rule adopted by the Court." (479 U.S. 314, ___, 93 L. Ed. 2d

649, 661, 107 S. Ct. 708, 715.) By relying on the purpose of the *Hett* rule, the majority "reintroduces precisely the type of case-specific analysis" that the Court rejected as inappropriate for cases pending on direct review. 479 U.S. 314, ___, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 715.

Second, the majority's reliance on the supposition that the *Hett* rule does not touch the truth-seeking function creates a striking paradox: under the majority's analysis the purpose to be served by the new rule is both a threshold requirement for employing the three-part *Laws* test and the first factor in the test. If the majority is correct in its method of determining the applicability of the *Laws* analysis, *Laws* will actually become a two-part test, since the purpose factor will automatically weigh against retroactivity whenever the test is triggered. The majority's ill-advised effort to avoid *Griffith* makes hash even of the *Laws* balancing test.

Third, the majority's impression that the retroactivity question here concerns the "statutory right to waive the sentencing jury" (117 Ill. 2d at 290) is mistaken. Perhaps confused by its own alternative holdings, the majority has apparently slipped into the error of suggesting that the question is whether that portion of *Hett* requiring a judge to accept a pretrial waiver of the sentencing jury is retroactive. That cannot be the correct question, as examination of the majority opinion makes evident. While incorrectly stating that *Hett* left the waiver question open, the court explicitly holds *in this case* that a judge must accept a knowing pretrial waiver. (117 Ill. 2d at 287.) Only after so holding does the majority turn to the distinct problem of whether a jury properly waived for sentencing in accordance with the statute can nonetheless be death-qualified (117 Ill. 2d at 288). The retroactivity discussion, therefore, is not about the retroactivity of the statutory right to waive the jury, but about the

ability of prosecutors to death-qualify a jury so waived. I cannot agree, for reasons stated later in this opinion, that this issue is either "purely procedural" or one which "in no way implicates the fundamental fairness" (117 Ill. 2d at 289-90) of the trial.

As is obvious from what I have stated thus far, the majority has perceived a retroactivity question where there is none and then it has applied the wrong test of retroactivity. But even assuming the three-part *Stovall* test could be applied, the majority's interpretation of the factors is insupportable. The second factor in the *Stovall* analysis is the extent to which law-enforcement officials have justifiably relied upon a prior rule of law supplanted by the new rule. As the majority admits, this court has never suggested that Witherspooning a jury which would have nothing to do with sentencing is necessary, permissible, or sensible. Nor could any appellate court authority have been relied upon here. Although the appellate court held in *People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, that a sentencing jury could not be waived prior to conviction, *Wolfbrandt* was filed more than a year after the *voir dire* of the jury in this case.

While the majority acknowledges that *Hett* "does not replace a prior rule" (117 Ill. 2d at 291), it inexplicably draws the conclusion that the reliance factor is therefore "inapplicable" (117 Ill. 2d at 291) here. If the reliance factor is to make any sense, however, the lack of any justified reliance on a prior rule of law—either because the reliance was unjustified in fact or, as in this case, there was nothing for the State or the courts to rely upon—must weigh in favor of retroactivity. Unsurprisingly, the majority has cited no authority for the proposition that the reliance factor may be neutral or "inapplicable."

Even more puzzling is the majority's use of the third *Stovall* factor, the impact on the administration of jus-

tice. Without any factual record whatever, or even any facts of which we could take judicial notice, the court speculates that retroactive application of *Hett* "might well place a severe strain" on the administration of justice. (117 Ill. 2d at 291.) Recognizing that there is nothing to support this conjecture, the majority then thrusts the burden of proving that the impact of *Hett* would be "manageable" (117 Ill. 2d at 291) on the defendant, and finds that the defendant has made no showing that it would be. The majority offers no authority for the suggestion that one who supports retroactivity has any burden of proving its appropriateness, and I know of none. Since the general rule is that judicial decisions apply retroactively, if any burden exists it should rest upon the party seeking to avoid the general rule—the State.

I am at a loss to understand how a defendant on direct appeal of his murder conviction to this court could presume to make such a showing. We have no procedure under which a defendant may engage in discovery while on appeal, and a defendant therefore has no way to obtain the necessary information. By contrast, the relevant factual information is readily available to the State, which must know how many cases are pending on direct appeal in which a jury has been Witherspooned after the defendant waived or tried to waive the jury for the sentencing phase of the proceeding. Since the State has made no such showing, there is no reason to think the retroactive application of *Hett* would disrupt the administration of justice. Given the weakness of the second and third *Stovall* factors when applied here, there can be no doubt that even under that test *Hett* should be applied retroactively.

Having already held that *Hett* does not address the propriety of death-qualifying a jury which has been waived and that, even if it did, the rule announced in *Hett* is not to be applied retroactively, the majority finds

it necessary to bury *Hett* by precluding any enforcement of the rule on appeal. As the majority sees it, *Hett* was a useless decision which is better ignored than respected because Witherspooning a jury which does not pass sentence does no harm. The majority reads the defendant's argument as merely an objection that exclusion of prospective jurors who state that they could not impose the death penalty violates his fourteenth amendment right to an impartial jury; this position is, of course, foreclosed by *Lockhart v. McCree* (1986), 476 U.S. 169, 90 L. Ed. 2d 137, 106 S. Ct. 1758.

The defendant is not saying, though, that his jury fails to measure up under the United States Constitution, but rather that under Illinois law it is improper to distract the jury with the question of sentencing "[w]here, as in the present case, the jury has nothing to do with fixing the punishment" (*People v. Galloway* (1963), 28 Ill. 2d 355, 362). Whether or not the jury was so unfair as to run afoul of the fourteenth amendment, it seems plain to me that needlessly injecting the emotional and controversial issue of the death penalty into this case inevitably colored the jury's deliberations on guilt or innocence. Although this distraction and prejudice may be unavoidable evils when the jury will hear both the guilt and penalty phases of trial, there is no counterbalancing interest which justifies any mention of the death penalty once the jury has been waived for sentencing. If there is such an interest, and that interest in a particular case is weighty enough to overcome the prejudice to the defendant, the State should have the burden of so proving. Needless to say, no such interest has been established here.

I would reverse and remand for a new trial.

CHIEF JUSTICE CLARK joins in this dissent.